## The Bank of Columbia, *appellants*, and The Attorney General, *respondent*.

In a *proceeding against a bank* by the attorney general under the "act to prevent fraudulent bankruptcies by incorporated companies, and to facilitate proceedings against them," if, in the bill filed by way of *information*, facts and circumstances are stated, verified by affidavit expressing *belief* in the truth of those facts, and they are of such a character as to raise a fair presumption that the bank proceeded against is insolvent, and are *not contradicted or explained* by the bank, on a motion for the appointment of a *receiver* after due notice, the fact of insolvency will be considered as proved within the meaning of the act.

A *receiver* may be appointed by the chancellor in the first instance, without a previous reference to and appointment by a master.

The amount of the security to be given by the receiver rests in the discretion of the chancellor.

A direction by the chancellor to a master not to take a nomination of any person as *receiver* who was an officer or agent of the bank proceeded against at the time it stopped payment, or at any time within six months previous thereto, is discreet and proper.

The act of the legislature under which these proceedings are had is a valid and not an unconstitutional law as it respects incorporations granted previous to its passage.

Opinions supporting the decision of this court delivered by Mr. Justice SUTHERLAND and Senators S. ALLEN, BENTON and OLIVER. Opinions in opposition delivered by Senators E. B. ALLEN and MAYNARD.

APPEAL from chancery. On the 13th June, 1829, the attorney general of this state filed an information against the

president, directors and company of the Bank of Columbia, in which he stated the incorporation of the company on the 6th March, 1793, for banking purposes; that the company commenced and pursued the business of banking by the issuing of bank bills or notes in the name of the corporation, and by receiving deposits and making discounts, and that they continued such banking operations for the space of thirty-six years, during which time large sums of money were received by the corporation, large amounts of bank bills were issued and put in circulation, and that the corporation acquired various species of property and choses in action; and he further stated, that while large amounts of the bills or notes of the corporation were in circulation, and while the corporation was otherwise largely indebted, the said corporation, by the fraud, neglect or mismanagement of some or all of its officers and agents, had become and then was, as he the attorney general had been informed and believed, wholly insolvent and unable to pay its debts, or to redeem its bills or notes in specie, or other lawful money of the United States; and that being so insolvent, the corporation had discontinued their banking operations, stopped payment of their debts and bills or notes, and neglected and refused to pay such debts or redeem such bills or notes in specie. The bill prayed an *injunction* restraining the corporation from the exercise of its franchises, from collecting or receiving any debts due, and from paying out or transferring any monies or effects belonging to the corporation; it also prayed for the appointment of a *receiver* to take charge of the property, monies and effects of the corporation, and to distribute the same among the fair and honest creditors thereof, and for a *subpœna*, &c. The usual affidavit accompanying an injunction bill was attached, made by the attorney general, that the several matters set forth in the information, as far as they concerned his own act and deed, were true of his own knowledge, and so far as they concerned the act or deed of any other person or persons or body corporate, he believed the same to be true. An injunction was allowed and served.*

Bank of Columbia
v.
Att'y General.

* This proceeding was had under the *seventeenth* section of the act entitled "An act to prevent fraudulent bankruptcies by incorporated companies, to facilitate proceedings against them, and for other purposes," passed 21st

ALBANY,
Dec. 1829.

Bank of Co.
lumbia
v.
Att'y General.

On the 15th June notice was served on the corporation, that on the 23d June the chancellor would be moved for the appointment of a *receiver* according to the prayer of the information, with a copy of which and with a copy of an affidavit made by the comptroller of the state, the corporation was at the same time served. The affidavit of the comptroller was made on the 13th June and stated, that for ten days and upwards then last past, it had been and still was commonly and generally reported and believed that the bank of Columbia had stopped payment, and had neglected or refused to redeem or pay the bills or notes of the bank in circulation, and that the bank was insolvent and unable to pay its debts ; and the same facts had been often published in the public newspapers, without any denial or contradiction to his knowledge or belief, and that he had no doubt that the said bank was insolvent and unable to pay its debts : and that the said bank for ten days then last past, and upwards, had neglected or refused to redeem its bills or notes in circulation.

Upon the hearing of the parties upon the above papers, the chancellor made a decretal order that a receiver be appointed according to the prayer of the information, and that he give bond with two sufficient sureties in the sum of $20,000 for the faithful execution of his trust. The chancellor also made a reference to a master to receive from the attorney-

April, 1825. (Statutes, Vol. 7, 448, a.) By this section it is enacted, "That *it shall and may* be lawful for the attorney general of this state, and it is hereby made his duty whenever any incorporated bank is insolvent and unable to pay its debts, or has violated any of the provisions of the act incorporating such company, and also, it shall be lawful for any creditor of any such company to apply by petition to the court of chancery, setting forth the facts and circumstances of the case; and upon its being proved to such court that such company is insolvent, or that it has violated any of the provisions of the act incorporating such company, or of any other act which shall be binding on such company, it shall and may be lawful for such court to issue an injunction to restrain such company and its officers from exercising any of the privileges, or franchises granted by the act incorporating such company, or by any other act, and from collecting or receiving any debts, and from paying out, or in any way transferring any of the monies or effects of such company until such ·court shall otherwise order; and it shall be lawful for such court to appoint a receiver of the property, monies and effects of said company, and to distribute the same among the fair and honest creditors thereof."

general, or any creditor of the bank or any other persons interested in the matter, nominations of a proper person to be appointed receiver, naming a day for the receiving of the nominations; directing the master, however not to receive a nomination of any person as receiver who was an officer or agent of the bank at the time it stopped payment or at any time within six months previous thereto, and ordering him by a certain day to report the names of the persons nominated and their fitness, and the names of the sureties proposed and their sufficiency. The reasons of the chancellor may be seen in 1 Paige's Ch. R. 511.

From this order the corporation appealed. The cause was argued by

*A. Van Vechten*, for the appellants; and by

*Greene C. Bronson*, (attorney-general,) respondent, in person.

The following points were made on the part of the appellants:

1. The appellants were a corporation created and existing under the constitution and laws of this state and of the United States prior to the year 1825; the rights, privileges and powers of the corporation were not affected by any act of the legislature to which it was not a party. The act of 1825 is therefore void and inoperative as to the appellants.

2. The bill of information does not set forth any facts or circumstances to authorize the chancellor to cause a receiver to be appointed, or to take the estate of the corporation out of the hands of its officers.

3. The chancellor had not before him any legal or sufficient evidence of the insolvency of the corporation, or of their violation of any law, to justify his making any order for the appointment of a receiver.

4. The appointment of a receiver is a *duty that devolves* upon a master; the power of the chancellor over the question arises upon an appeal from the master's appointment.

5. The amount of security to be given by the receiver should be graduated by the amount of assets to be commit-

ted to his charge. The chancellor had no evidence before him or means of ascertaining facts to govern his discretion, but by a refernce to a master.

6. The chancellor erred in prohibiting the master from receiving the nomination of any person as a receiver who was an officer or agent of the bank at the time it stopped payment or at any time previous thereto.

The following opinions were delivered:

By Mr. Justice SUTHERLAND. It was contended, on the part of the appellants, that it was not sufficient for the attorney general to make out a *prima facie* case of insolvency, but that it was his duty to establish the fact by clear and incontrovertible evidence, before the court of chancery had any right to move in the case. If, by the *insolvency* of a bank be meant its absolute and final inability to pay its debts, it is, manifest that the fact insolvency can never be clearly and positively established, without a full developement of all its concerns. The amount of its notes in circulation, of its debts of every other description, the value of its real and personal estate in possession, the amount of debts which may be due to it, and the ability or inability of each of its debtors to pay, must first be ascertained before it can be positively affirmed of any bank that it is unable to pay its debts. If the attorney general is bound to ascertain and state all these facts and circumstances in his bill, and to arm himself with evidence to support his allegations, it is manifest that this part of the act can never be enforced, and might better be expunged from the statute book. The attorney general has no authority to demand an inspection of the books of a bank, or a disclosure of its concerns. His means of knowledge upon this subject are those and those only which are possessed by the community at large. He can judge of the actual condition of a bank only from external facts and circumstances, and those are the facts and circumstances he is bound to state in his bill and establish by proof before the chancellor.

It is not sufficient for the attorney general to allege, in general terms, that he believes a particular bank to be insolvent and unable to pay its debts; he must state the facts and

circumstances upon which that belief is founded, and if they are such as to raise a fair presumption of its insolvency, or, as it is commonly expressed, to make out a *prima facie* case and are uncontradicted or explained by the bank, the fact of insolvency is, in my opinion, proved within the meaning of the act. The act requires that the insolvency shall be proved, but it does not direct in what manner it shall be proved; it does not say that it shall be proved by two witnesses, nor that the proof shall be direct and positive, nor that circumstantial evidence shall be insufficient or inadmissible; it leaves the matter at large; it must be proved to the satisfaction of the conscience and judgment of the chancellor, according to the established rules of evidence and the course and practice of the court. The maxim of the common law, that every man shall be presumed to be innocent until he is proved to be guilty, is as authoritative as though it were embodied in a statute, and yet how few of the vast multitude who have been criminally tried and condemned have been convicted upon any other than circumstantial evidence. The proceedings authorized by the 17th section of the act were evidently intended to be *prompt* and *summary*. The object of the legislature was to arrest the operations of failing or insolvent banks, and to save from the wreck something for their fair and honest creditors.

If *prima facie* evidence of insolvency be not sufficient to authorize the chancellor to interfere, it is obvious that no injunction can ever be issued or a receiver be appointed until the officers or directors of the bank against which the proceedings are instituted have been compelled, either as parties or witnesses, to make a full disclosure of its affairs. At the close of a chancery suit, after abundant time has been afforded to the directors and officers to collect all the outstanding debts and distribute as they may think proper all the funds of the bank, an injunction may be issued and a receiver be appointed; for what useful purpose it is difficult to imagine. Such never could have been the intention of the legislature, nor is it, in my opinion, the fair construction of the act. .

VOL. III.              75

*Margin:* ALBANY, Dec. 1829. Bank of Columbia. v. Att'y General.

The attorney general states in his bill that he has been informed and believes that the bank had become wholly insolvent and unable to pay its debts or redeem its notes, and that it had discontinued its banking operations and ceased to redeem its notes, and he swears that he believes such information to be true. It might not, perhaps, be expedient to hold that the simple neglect or refusal of a bank to redeem its notes should, in all cases and under all circumstances, be even *prima facie* evidence of its insolvency. There may be a temporary run upon a bank which may exhaust its specie, and put it out of its power for a few hours, or perhaps days, to redeem its notes, without shaking the confidence of the public in its stability; but it is in all cases and under all circumstances a strong ground for suspicion, and when to this is added the oath of the law officer of the state, whose duty it is to enforce the provisions of this act, that he believes such bank to be insolvent and unable to pay its debts, I think considerations of public policy, as well as a due regard to the objects which it was the intention of the legislature to accomplish, require us to consider the fact of insolvency as proved within the meaning of the act in question. When we consider how important it is to the community at large and to these monied corporations that their credit should be unsuspected, and the facility with which, in the ordinary state of the country, temporary loans can be obtained to any amount upon adequate security, for the purpose of sustaining a bank, it is fair to conclude that a bank that refuses to redeem its notes is destitute of substantial funds as well as credit. But if the suspension of its operations be owing merely to accidental and temporary causes, it can easily be shewn to the court, and the presumption of insolvency will be repelled.

I am aware that it was held by the supreme court in the case of *The Jefferson County Bank* v. *Chapman*, (19 Johns. R. 322,) that the refusal of a bank to pay its bills was not sufficient evidence of its insolvency to prevent the *bona fide* holder or purchaser of their bills, after such refusal to redeem, from setting off such bills against a note held and prosecuted against him by the bank. But what was that case? The bank sued Chapman upon a note made by him the 26th of

April, 1819, payable in 90 days. He pleaded the general issue, with notice of set off, and upon the trial offered in evidence, by way of set off, band bills or notes issued by the band of a date prior to the commencement of the suit. The bank stopped payment before the defendant's note became due. The set off was objected to, first, on the ground that it did not appear that the bills offered as a set off were in the hands of the defendant before the commencement of the suit. This was held by the court to be a fatal objection to the set off, and the cause was decided on that ground. It was also said that the notes were purchased by the defendant after the bank had stopped payment and became insolvent, and that it would be a fraud upon the other creditors of the bank to allow a set off under such circumstances. The bank, the plaintiff, alleged its insolvency, to defeat the set off; and, as evidence of its insolvency, shewed that it had ceased to redeem its bills. Under such circumstances, it was correctly said by the court that the refusal of the bank to redeem its bills did not prove that it was insolvent. If a party sets up his own insolvency to defeat a claim against him, he must prove it. The fact, if it exists, must be within his knowledge, and he is bound to produce the best evidence of the fact, which from the nature of of the case, may be presumed to be within his power.

But it is said that it is apparent from the 6th section of the act under which these proceedings are had, that the legislature did not intend that the neglect or refusal of a bank to redeem its bills, *for any period short of a year*, should be evidence of its insolvency. That section, among other things, provides, "that whenever any incorporated company shall have remained insolvent for one whole year, *or for one year shall have neglected or refused to redeem its notes, &c.* or shall for one year have suspended the ordinary business of such incorporation, such company shall thereupon be deemed and adjudged to have surrendered the rights, privileges and franchises granted by any act of incorporation, *and shall be deemed to be dissolved.*" By this section it will be perceived that the neglect of a bank to redeem its notes *for a year*, produces, *per se*, a dissolution of the corporation. As soon as the

ALBANY,
Dec. 1829.

Bank of Columbia
v.
Att'y General.

fact is judicially ascertained, the corporation is at an end. No explanation is admissible. The fact is made conclusive evidence of the insolvency of the corporation; but it by no means follows that because the legislature have said that a neglect of a bank to redeem its bills, or carry on its ordinary operations for a whole year, shall be *conclusive evidence* of insolvency, *and shall dissolve the corporation,* that a suspension of its business and a refusal to redeem for a shorter period shall not be *presumptive evidence* of the same fact, for the purpose of authorizing the chancellor to issue an injunction. The objects of the two sections are entirely different.

The next inquiry is, whether the fact that the bank had discontinued its business and neglected or refused to redeem its notes, was proved before the chancellor by competent and sufficient evidence. The attorney general produced no evidence except his own affidavit attached to his bill, and the affidavit of the comptroller of the state. The attorney general does not profess to have any personal knowledge in relation to the facts set forth in his bill, but merely swears that he believes them to be true. The comptroller states, " that for ten days and upwards then last past, it had been and then was commonly and generally reported and believed that the bank had stopped payment, and had neglected or refused to redeem or pay its bills or notes in circulation, and that the bank was insolvent and unable to pay its debts; that the same facts have often been published in the public newspapers without any denial or contradiction to his knowledge or belief; and that he has no doubt that the bank is insolvent and unable to pay its debts, and that it has for ten days last past and upwards neglected and refused, and still does neglect and refuse to redeem its bills or notes in circulation." This affidavit was served upon the solicitor of the appellants, with a notice from the attorney general that upon the information exhibited and the said affidavit, the chancellor would be moved that a receiver be appointed. The motion was opposed on the ground, as I understand it, that the neglect of the bank to redeem its notes was not proof of its insolvency within the meaning of the act. But the fact that the bank had discontinued its operations and stopped payment of its

bills, I understand to have been tacitly admitted, or certainly not denied. It was a matter of such public notoriety, and had produced so deep a sensation throughout the community, that strict and technical proof of the fact was probably deemed unnecessary, both by the parties and the court. It is also stated, in the opinion of the chancellor, that before the motion came on, similar information to that contained in the bill and affidavits presented by the attorney general had been communicated to the court by the oaths of certain. creditors of the institution, who had applied for and obtained injunctions in the city of New-York. Under all these circumstances, I think we may consider the fact that the bank had stopped payment as conceded before the chancellor. A fact of such public notoriety, if not denied either by evidence or in argument, the chancellor might well consider as admitted.

The position advanced by the counsel for the appellants that the chancellor has no right to appoint a receiver, but that the appointment must be made by a master in the first instance, and can be controlled by the chancellor only upon appeal, appears to me to be unsound. The reference to a master in this and most other cases is for the convenience of the chancellor and to facilitate and expedite the business of the court; but where there is no statute regulations upon the subject, it cannot be a ground of appeal that the chancellor does himself, in the first instance, what he has an unquestionable right finally to control.

The master, in this case, was ordered to receive nominations of proper persons to be appointed receivers, to decide upon their competency and the sufficiency of their sureties, and to report to the court the names of the respective persons nominated and their fitness for the appointment, and the names and sufficiency of the several persons proposed as their sureties. It will be perceived, that under this order all the preliminary investigations are to be made by the master, and he is to report all the facts and his opinion as to the fitness of the respective persons nominated for the office. The chancellor upon this report has all the light and evidence upon the subject, and perhaps more than he would have upon a regular appeal from the master's order, and is

ALBANY,
Dec. 1829.

Bank of Columbia
v.
Att'y General.

ALBANY,
Dec. 1829.

Bank of Co-
lumbia
v.
Att'y General.

possessed of all the means requisite to a judicious selection of a receiver which were possessed by the master himself. There certainly is nothing wrong in principle in the chancellor's reserving to himself, under such circumstances, the nomination of a receiver; and the course adopted by him saves some of the expense and delay which would be produced, by what is alleged to be the ordinary mode of proceeding.

Nor is there in my opinion any well founded objection to that part of the decree which directs the receiver to give a bond with two sufficient sureties in the sum of $20,000. It is said that the amount of the security should be graduated by the amount of assets which would probably come into the hands of the receiver, and that the chancellor had no means without a reference to a master of forming any discreet opinion upon the subject. A receiver, when appointed, becomes an officer of the court, and is bound to obey all the orders and directions of the chancellor in relation to the fund in his hands. The chancellor may compel him to pay into court or to distribute the fund among the creditors of the bank, whenever it shall amount to any particular sum, and in this way prevent an accumulation of assets in his hands which shall exceed the amount of his security. He may be required to report weekly or monthly so as to keep the chancellor constantly informed as to the state of the trust fund. It is not necessary, therefore, to insure the safety of the fund, that the security given should be equal to the aggregate amount which will probably pass through the hands of the receiver; and such a regulation I apprehend would have the effect of excluding from those appointments that class of men who would be most likely to execute the trust with intelligence and fidelity. The character of the receiver as a man of business and integrity, is much more important than the amount of the security which he may be required to give. Nor is the rule contended for, that which is generally adopted in relation to public officers.

The only remaining point relates to that part of the decree which directs the master to receive no nomination of any person as receiver who was an officer or agent of the

bank at the time it stopped payment, or at any time within six months previous thereto.

The selection of a receiver from the names presented to the chancellor was a matter of sound discretion. It is not pretended that an appeal would lie from his decision upon the subject; most certainly not unless there were the most substantial objections to the person named. The refusal of the chancellor to appoint any particular individual would not be a ground for an appeal, and the appellants can hardly be said to be aggrieved by an order which excludes their officers from the list of nominations to be received by the master, when, if their names had been received, it was in the power of the chancellor practically and definitively to exclude them from the appointment. It was unnecessary for the chancellor to insert in his decree the provision in question; he might have left the master unrestricted in this respect, and have suspended his final judgment upon the subject until it became necessary for him to make the appointment; but I have no hesitation in saying that the considerations stated in the opinion of the chancellor have entirely satisfied me that it would have been an act of gross indiscretion in him, under the circumstances of this case as they existed when the decree was pronounced, to have conferred the appointment of receiver upon any of the officers of the bank. He observes; " The officers of the bank had made no expose of any of their concerns to the public: when called upon to shew cause why a receiver should not be appointed, they produced no accounts nor gave any information to the court as to the amount of their debt, or their means of payment. They did not even state when, or by what means their capital of $169,000 had been lost, so as to enable the court to form an opinion, whether it would be right or proper to entrust the interest of their numerous creditors to the care or management of one of their number. It was impossible to ascertain without a long and tedious examination of some weeks, or perhaps months, whether it might not be the duty of the receiver to institute proceedings against every officer of the corporation under some of the provisions of the statute of 1825. If the property of the institution had been assigned

by them to pay favored creditors, in contemplation of insolvency, or after they had stopped payment, it would be the duty of the receiver to prosecute them for the purpose of obtaining the amount for the benefit of the creditors generally; if they were indebted to the institution, it might be necessary to enforce the collection of such demands by suit; and if there had been any fraud or mismanagement of the institution by which the officers had made themselves personally liable to the creditors, it would be the duty of the receiver to investigate the subject, and expose the fraud, if any existed." I can add nothing to the force of these observations.

I have not thought it necessary to discuss the question as to the constitutionality of the act under which the proceedings in this case were instituted, and are conducted. The counsel for the appellants avowed that the point was suggested by him for the purpose of saving the ulterior rights of his clients, and not because he deemed it important in the decision of this case. I shall therefore content myself with saying, in general terms, that in my opinion there is no ground for questioning the constitutionality of the act.

I am for affirming the decree of the court below.

The Chief Justice and Mr. Justice MARCY expressed their concurrence in the opinion delivered by Mr. Justice SUTHERLAND.

By Mr. Senator E. B. ALLEN. In the view I have taken of this case it will be necessary to notice only one of the objections taken by the appellants, and that is as to the sufficiency of the proof upon which the order was granted.

What was the proof before the cancellor, and what proof does the statute require? By the statute it is enacted that upon its being *proved* to the court of chancery that any incorporated bank is insolvent, or has violated any of the provisions of the act incorporating such company, or of any other act which shall be binding on such company, it shall and may be lawful for such court to issue an injunction, &c. and to appoint a receiver, &c. The material allegations in the bill to be proved are, the insolvency of the company; its having refused to redeem its notes and bills; having discontinued its

banking operations; and having stopped payment and neg- <span>ALBANY, Dec. 1829.</span>
lected and refused to pay its debts. It is obvious that the
first branch of the attorney general's affidavit furnishes no <span>Bank of Co-</span>
proof of any one of these facts. He says the several mat- <span>lumbia.</span>
<span>v.</span>
ters, so far as they concern his own act and deed, are true <span>Att'y General.</span>
of his own knowledge, but the bill does not shew that any
one of them concerns his own act and deed; in the other
branch of the affidavit he says, so far as they concern the
act or deed of any other person or persons, or body corporate,
he *believes* the same to be true. It is a naked belief only.
He does not speak from personal knowledge or observation
of any of the facts. The bill does not shew that he posses-
es any knowledge of the acts and deeds of other persons,
which it is necessary to prove. The ground of his belief was
hearsay and report. Does the affidavit of the comptroller go
far enough to furnish the proof required by the statute? It
is evident that he, too, swears upon mere belief without any
knowledge of facts. He says that for ten days and upwards,
it has been, and still is generally reported and believed, that
the bank had stopped payment, and that the bank was insol-
vent and unable to pay its debts. So far he swears only to
common report and the belief of others. He states further,
that he has no doubt the bank is insolvent and unable to pay
its debts, and that it has for ten days and upwards refused
and still does refuse to redeem its bills, &c. All, these affi-
davits amount to is, that the witnesses fully believe, from
hearsay and common report, that the bank is insolvent, has
refused to redeem its notes and bills, and has discontinued
banking operations. Could not any witness within the hear-
ing of those reports have made the same affidavits? A man's
belief of a fact, be it ever so confident, does not make him a
legal witness of the fact any more than if he had never heard
of it. We may all believe this bank is insolvent; but wheth-
er we do or not, is not the question. Has it been legally
and judicially proved within the meaning of the statute?

It was said on the argument that no objection was made
to the appointment of a receiver. How are we to know
that? We must take the facts as they appear in the case.

The rule recites that counsel was heard on the part of the appellants. There is no evidence of any admissions. There is nothing in the case to contradict the supposition that the sufficiency of the evidence was objected to on the motion for the order. The chancellor in giving his reasons for the decree says, no cause was shewn to induce the court to believe that the bank was able to pay its debts; and no information was given in relation to its concerns. Upon the silence of the appellants he holds the affidavits to be *prima facie* evidence of inability or insolvency. He observes, " that the bank had stopped payment was not conclusive evidence of its inability to pay its debts, but it was at least *prima facie* evidence of such inability or insolvency." Before this conclusion can be drawn, I would ask, how is it proved that the bank had stopped payment? The stopping of payment is supported by no stronger proof than the fact of insolvency. If the fact of stopping payment for ten days and upwards had been proved by legal and sufficient evidence, I grant it would have been *prima facie* evidence of insolvency.

It was also said on the argument that it would in most cases be very difficult to prove the insolvency of a bank except you could make its officers witnesses, and that inferior evidence should therefore be received; and if the bank were not insolvent the officers had it in their power to shew it. I thought there was force in the argument; but on reflection, it seems clear that the testimony of witnesses who knew the fact that the bank had stopped payment, or done any act which would be a violation of its charter, could be obtained without difficulty. Can it be seriously pretended that witnesses could not have been obtained in the neighborhood of this bank, who knew that the company had refused to redeem their bills, or to pay their debts, or had discontinued their banking operations?

The objection to the proof is, that it is merely the belief of the witnesses, founded upon hearsay and reports. In courts of law this kind of evidence is admitted only in cases of necessity. That there are cases where a party has been permitted to swear to his information and belief, and the adverse party, who alone could swear positively, called on to answer,

will not be denied. They are cases, I believe, where the
knowledge of the fact is confined to such adverse party, and
cannot be established without his admission; or where delay
would be productive of injury if such evidence were not ad-
mitted. But the question here is, not whether such evidence
may not in some cases be admitted, but whether it is such
proof as the statute requires. The proceedings under it are
rigorous and summary. The order for the appointment of
a receiver amounts to a judgment of forfeiture against the
company; all their important rights and privileges granted
by their act of corporation are suspended or entirely taken
away. It will not be a satisfactory answer to say that the
company may prevent the forfeiture by disproving the facts
set up in the bill, for the same proof is required before the
*injunction* can issue; and if that can be issued upon rumor
and reports, the mischief the legislature intended to guard
against, by requiring full and competent proof, would be pro-
duced. The reputation of any bank in the state might be
ruined, though perfectly solvent, and the bill holders subject-
ed to serious losses in the depreciation of the bank paper,
if an injunction can be issued upon such slight evidence. I
cannot believe that the legislature intended to give to the
court of chancery power to issue the injunction upon an *ex
parte* application, and pronounce a final judgment of ouster
without legal and sufficient proof. A different construction
would seem inconsistent with the plain language of the act;
it says, upon its being *proved* to such court that such compa-
ny is *insolvent*, or that it has violated any of the provisions,
&c. it shall and may be lawful, &c.

Our supreme court have decided in several cases, that
where a statute requires *proof* to be made before a proceed-
ing can be had, it means *legal proof*, and that jurisdiction
to issue process could not be obtained without it. (*Brown*
v. *Hinchman,* 9 Johns. R. 75. *Van Steenbergh* v. *Kortz,* 10 id.
167. *Vosburgh* v. *Welch,* 11 id. 175.) This question came
directly before chancellor Sanford, in the case of the *Attor-
ney General* v. *The Bank of Chenango,* (1 Hopkins' Ch. R.
596.) That was an application for an injunction against
the bank and for the appointment of a receiver. A similar af-

fidavit was made by the attorney general. The chancellor refused the injunction upon the insufficiency of the proof. His reasoning appears to me conclusive. He observes, that courts of law do not pronounce such a judgment as the statute requires until a formal and full investigation of the cause has taken place. That before an injunction can issue, the court must determine that the bank is insolvent, or has violated some provision of law; that the proof to be used in support of the application for an injunction may be taken summarily; but that all proof in courts of justice is subject to the established rules of law and reason concerning evidence.

I am of opinion the decree of the chancellor for the appointment of a receiver ought to be reversed. There being no appeal from the injunction, that will not be affected by our decision here, and the attorney general will only be required to produce further evidence of the insolvency of the bank or a violation of some provision of law, to entitle him to ask for the appointment of a receiver.

By Mr. Senator S. ALLEN. It has appeared to me that there was force in the observation made by the counsel for the appellants, that the charter granting a bank was, in effect, a contract entered into between the legislature and the corporation.

Several instances might be cited, where one of the conditions to be performed by a corporotion for banking purposes was, that they should pay to the treasurer of this state, within a limited period from the passage of the act, a specific sum of money; and that the corporation should loan to the state, when by law required, a designated amount at an interest, one or two per cent. below the legal rate. These or similar provisions will be found in the charter of the Bank of America, the City Bank, and the Mechanics' Bank of the city of New-York. Now if certain chartered privileges have been granted by the legislature on the condition that the corporation perform some specific act within a given time, and the bank perform on their part all the requirements of the charter or agreement, is it competent for the legislature to impose restrictions on the company incompatible with the

original compact? In the case of *Wales* v. *Stetson*, as cited in Bigelow's Digest, page 181, it was held that rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation.

This question, however, so far as it relates to the Bank of Columbia, appears to be put at rest by the decision in the case of *Slee* v. *Bloom*, (1 Johns. Dig. 418,) where it was held, if a corporation suffer acts to be done which destroy the end and object for which it was instituted, it is equivalent to a surrender of its rights; and the Bank of Columbia, having suspended its business and refused to redeem its notes or to pay its debts, (the end and object for which it was created,) is, in this respect, destroyed and the corporation must be considered as having surrendered its chartered rights. The fact that the bank had ceased to pay its notes, was in my opinion, sufficiently notorious to authorize the information filed by the attorney general, and the proceedings had thereon by the chancellor.

A point insisted on by the counsel for the appellants was, that it was not the province of the chancellor to appoint the receiver, but that he ought to be appointed by the master. In the case of *Verplank* v. *Caines*, (1 Johns. Dig. 37,) it was held that the appointing of a receiver rests in the sound discretion of the court. It is also said in 3 P. Wms. 379, that a receiver is the hand of the court. If, then, the appointment is at the discretion of the court, the receiver must be the officer of the court, and consequently cannot be appointed except by the court or its direction.

The office of receiver is one of high trust, and as the manner of executing that trust, in the event of a charge of fraud or improper acts, may be brought under the review of the master by direction of the court, it would seem both reasonable and proper that the appointment should not rest with the master, but with the court.

As to the objection that the security directed by the chancellor is insufficient, I have only to observe that this is a matter which must of necessity be left to the sound discre-

tion of the chancellor, who, in demanding security, must be guided by the nature of the trust, and the character and standing of the person, as well as the amount to be entrusted.

The direction to the master to receive no nomination of an officer or agent of the bank, was, in my judgment, a very proper restriction. The persons legally disqualified from being appointed receivers are (as per Hoffman's Chancery, 156,) trustees, solicitors in the cause; and in the opinion of an English chancellor, all professional persons are improper. The directors and officers of a corporation are the trustees of those interested in the property; and it would be improper, therefore, even if there was no legal objection in the way, to appoint either of the officers of a corporation, situated as the Bank of Columbia is, a receiver; as it might be the case, that under the direction of this very person, the inability of the institution to pay its debts may have occurred. The directors and officers are interested parties, and may be, as is frequently the case, deeply indebted to the bank; and a person thus situated, in no event ought to be placed in an office where his private interest may, if only by possibility, induce him to act in a manner incompatible with the general interest of all concerned.

There seems to be some reason too for excluding professional men as receivers; not that they would perform the duties of the office with less integrity and uprightness than others, but because in collecting the debts of a monied institution and disposing of its property, a more perfect knowledge of accounts and extended information of the responsibility and standing of the mercantile and trading part of the community is necessary than what is generally possessed by professional men; and as there must in all these cases be more or less suits instituted for the recovery of the debts due the corporation, it may be a question also whether inducements would not be held out to a man thus circumstanced to increase these suits unnecessarily, and by that means incur expense injurious to the creditors of the institution.

I am, however, in favor of affirming the decretal order of the chancellor, and of dismissing the appeal with costs.

By Mr. Senator BENTON.   In discussing the questions ari-
sing in this cause, it seems proper to examine them in the or-
der they present themselves upon a consideration of the facts
and the grounds assumed upon the argument.   The proprie-
ty of this arrangement will be obvious when we consider that
either of two of the questions presented upon the argument
by the appellants' counsel, if sustained, go to the very foun-
dation of the whole matter here; one in the shape of an ob-
jection to the *jurisdiction* for the incompetency of the proof,
and the other to the *constitutionality* of the law upon which
this proceeding is founded, or in virtue of which this cause
was originally instituted in the court of chancery.

At common law, chancery had no jurisdiction over the
subject matter of this controversy to proceed in this manner;
it is given by statute, (Sess. Laws of 1825, ch, 325,) and un-
less the incipient proceedings conform substantially to the re-
quisitions of the act, and unless a case contemplated by the
legislature exists, chancery can neither take cognizance of
the matter nor proceed in the cause.   The attorney general
is bound, by his oath of office, to institute proceedings of this
nature whenever a case arises within the statute.   The 17th
section of the act provides that the attorney general shall in-
stitute proceedings whenever any incorporated bank is insol-
vent and unable to pay its debts, *or* has violated, &c.; and
also, it shall be lawful for any creditor of any such company
to apply by petition to the court of chancery, setting forth the
facts and circumstances of the case, and upon *its being prov-
ed* to such court that such company is *insolvent*, or that it has
violated, &c. the court shall issue an injunction to restrain,
&c.   The statute further authorizes and directs the appoint-
ment of a receiver.   It appears, then, that this summary
proceeding may be had when the institution is insolvent, or
has violated its act of incorporation without insolvency.

The facts and circumstances necessary to be set forth and
established in the one case are simple and direct, and, in
most instances, the establishment of the fact of insolvency is
enough, while in the other, where the proceeding might in-
volve an enquiry into the various and complex acts and
transactions of the officers of the bank to prove a technical

*Margin note:* ALBANY, Dec. 1829.

Bank of Co-
lumbia.
v.
Att'y General.

violation, or a direct and positive mis-user, might well lead to an examination into long and intricate details of facts and circumstances ; and in order to get at the proof and lay the foundation for its admission, it would be necessary to specify the circumstances in the petition, or state and charge them in the bill, and in the event of proving or making out a case for the interference of the court of chancery, a perpetual injunction would, in most instances, follow.

In giving a construction to this statute which is supposed to be fair and reasonable, a construction corresponding with the intent of the legislature, it may not be unimportant to enquire into the character, duties and practices of banking institutions. Anterior to the restraining act, so called, every citizen or association of citizens had the right of banking, as the term is now understood. From motives of policy, (and public protection was undoubtedly the basis,) the legislature thought proper to abridge that right, and banking is now a franchise to be exercised only by special grant of the legislature ; and the note or bill of an incorporated bank in good standing, and possessing public confidence, has long been considered the representative of the current coin of the country. The pledge to the public under this legislative grant is, that the bank will pay its depositors all sums due them on demand at their counter, and redeem their notes and bills in specie or current funds whenever presented for payment at the usual hours of banking business. Such, no doubt, is now the practice and mode of doing business, and was at the time the above statute was enacted, with all sound and solvent banks : a different course would create distrust and fears in respect to the solvency of the institution, cause embarrassment and inconvenience, and the individuals of the community would suffer loss in consequence of the depreciation of its bills in the money market. The act of 1825 is *remedial;* it profeses to regulate monied corporations in certain of their acts, provides for the more speedy collection of debts owing by them, but inflicts no penalty. What, then, is the insolvency mentioned in the statute, and within the contemplation of the legislature ? Is it an utter and entire destruction, subversion and loss of the whole or of a part of the

funds of the institution, and must the fact be proved; or is it <span>ALBANY,</span>
a general inability to meet engagements and make payments <span>Dec. 1829.</span>
by a redemption of the bills and notes of the bank in the usu- <span>Bank of Co-</span>
al and accustomed manner? It seems the court of chancery <span>lumbia</span>
in England have applied the latter rule in giving a construc- <span>Att'y General.</span>
tion to the bankrupt law in that country.

The question of intent is properly deducible from existing
evils, and it cannot be a very grave proposition here whether
the legislature intended to protect the debtor and not the
creditor, since they have directed the law officer of the state
to interpose in all cases.

When a monied corporation neglects or refuses for ten
days and more to redeem its notes and bills payable at its
counter, in the absence of all proof explaining the transac-
tion, to what cause shall such an act be attributable? Shall
we say the bank is perfectly solvent, and able to pay its debts
and redeem its bills in circulation? The law raises a different
presumption. A strong legal presumption of inability or in-
solvency arises from the fact of neglect or refusal to pay in all
cases like the present. The establishment of this fact of neg-
lect or refusal would seem to be enough. The proof relied
upon in this case is the information, which is sworn to in the
usual form of injunction bills, and the affidavit subsequently
sworn to by the financial officer of the state, both of which
were served upon the appellants. This is *presumptive evi-
dence* of insolvency, and sufficient, I apprehend, to call upon
the appellants to deny it, or give some explanation of their
conduct in respect to the facts stated. Instead of doing so,
they are entirely silent upon the subject, and the neglect to
*appeal* from the order allowing the injunction may properly
be deemed an admission that the evidence is sufficient to sus-
tain it until the answer comes in.

In the constitution of the United States, (art. 1, sec. 10,
subdivision ii,) certain powers are forbidden to the states in-
dividually. "No state shall pass any law impairing the ob-
ligation of contracts," is the declaration of the supreme law;
and it is well settled that a legislative grant, an act of incor-
poration, is a *contract* within this prohibitory clause, and this

VOL. III.                    77

ALBANY,
Dec. 1829.

Bank of Co-
lumbia
v.
Att'y General.

court are not now permitted to doubt the wisdom or policy of this construction. The appellants claim certain liberties, privileges and franchises by an act or acts of the legislature, and insist that the act of 1825, ch. 325, is unconstitutional and void. In what respect, then does this act, and particularly the 17th section, impair the validity of the grant to the appellants? Does it profess to alter, modify or take away any vested right? Certainly not, any further than to provide certain peculiar and efficient remedies upon the happening of certain contingencies; and these remedies are applicable to all banking institutions of the state created under its authority: but so long as the conditions of the grant are performed on the part of the grantees or corporators, so long they remain unmolested by any proceeeding under this section.

It is not pretended by the appellants that they by their grant have a right to refuse payment of their notes or bills when presented at their bank. The provision complained of is concisely this: If a banking corporation violate the conditions of its charter, or become insolvent without any other act of misuser, then certain proceedings may be instituted for the purpose of annulling the grant, or of preserving a remnant of his property and effects for the creditors of the corporation. A change or modification of the law authorizing the commencement and prosecution of suits to judgment, in a particular way, limiting the time within which actions may be commenced for preserving property from waste or destruction, and insuring a faithful application of the proceeds to the purposes intended, involve no violation of a grant or contract. The act must be direct and specific in its object pointed in its details, and must be absolute, and positive, not depending upon a contingency. There is, I apprehend, a marked difference between the present provision and one which should authorize and direct the attorney general in any event, to file his information and procure an injunction against all or any of the banking institutions in the state, and by this means put an entire stop to their proceeding in business under their acts of incorporation. A right may vest

beyond the power of resumption in the sovereign authority, but the power to provide a remedy to compel a compliance with the conditions of the grant, it is presumed, always remains. The remedies must always be within the control of the legislative branch of the government, subject to alteration, amendment and modification. The appellants, by their act of incorporation, became possessed of certain rights and franchises, not here necessary to be enumerated, which cannot be altered, modified or repealed while the grant exists, without their consent. They continued in the enjoyment of them for a long series of years, and more than four years after the passage of the act of 1825. Does this act take away any vested right ? Does it compel the performance of any act or duty not obligatory upon them by the very terms of the original grant? A waste, subversion and destruction of the funds and capital of the bank, power to refuse payment of debts, and redemption of notes or bills when presented for payment, and a right to become insolvent, are not presumed to be any part of the liberties, privileges and franchises usually granted to banking institutions. The 17th section of the act provides summary proceedings in cases only where corporations have violated the conditions of the grant. The alleged violations must be proved in the due course of judicial investigation ; judgment without proof is not authorized or required.

In cases of insolvency, the court of chancery is clothed with power to interpose, to stop further malversations, and legal frauds, and possess itself of the residue of the property of the corporation, in order to secure an equitable distribution of it among those by law entitled to it. In this case the court of chancery, it is believed, is compelling the performance of a duty obligatory upon the appellants by their act of incorporation.

Being well satisfied of the correctness of these views, I do not see how this act can be pronounced invalid by reason of the constitutional provision of forbidden powers.

The other questions presented for the consideration of this court, raised by the appellants' counsel, appear to me to be of legal discretion entirely; and although questions purely

*Margin:* ALBANY, Dec. 1829.

Bank of Columbia
v.
Att'y General

of this nature may be presented to this court for its decision and judgment, I think it should appear clearly that something has been done " contrary to · equity and good conscience," before this court will undertake to interfere and reverse the decision of a subordinate tribunal. Upon these principles, it is not perceived wherein the court of chancery erred respecting the appointment of a receiver. The chancellor has a perfect right to do what he can direct others to perform in his stead, unless he be controlled by legislative authority. The receiver is at all times subject to the direction and control of the court, and may be removed at any time. It might be convenient to parties, in many instances, to have the opinion of the chancellor uncommitted, on the appointment of a receiver or the allowance of an injunction. This convenience cannot in the least affect the powers of the court. There are no facts in the case, shewing the probable amount to come into the hands of the receiver. Twenty thousand dollars may be the full extent of the available funds of the bank ; but even if they were much larger, there could be no waste or diversion of them beyond the amount of the security, without the connivance of the chancellor, which is not to be presumed.

Upon the last point, I am also well satisfied that the chancellor exercised a sound legal discretion in directing the master not to receive the "nomination of any person as receiver who was an officer or agent of the bank at the time it stopped payment, or at any time within six months previous thereto." The proofs on the part of the respondent are deemed sufficient to raise a legal presumption of insolvency. These facts are not denied, and there is no attempt to explain why the bank had assumed the position of refusing to redeem its bills and pay its debts. The chancellor considered it his duty to place the remaining funds of the bank in the hands of some individual who stood indifferent between the debtor and creditor. Cases might arise in which there would be no necessity of giving such direction. I am of the opinion that the chancellor gave proper directions in this respect, and am of opinion that the order ought to be affirmed.

By Mr. Senator Maynard. One of the points presented for decision in this court is, " that the chancellor had before him no legal or sufficient evidence of the insolvency of the corporation or of their violation of any law to justify his making any order for the appointment of a receiver."

The only allegation against the corporation is that of insolvency, and the question is, was there sufficient evidence of that fact presented to the chancellor?

All the powers possessed by the chancellor over the subject matter embraced in the information are conferred by the statute; there must therefore be a strict and full compliance with its requirements. The 17th section of the act, after prescribing the mode of application, provides, *" that upon its being proved that such corporation is insolvent,"* the chancellor shall issue an injunction and appoint a receiver. No kind or quantity of evidence is prescribed. There is nothing in the act to induce the opinion that any relaxation in the rules of evidence or diminution of quantity to constitute proof was authorized or contemplated. The magnitude of the powers conferred by the statute, the consequences that must result from their exercise to the corporation charged with delinquencies, and to the numerous individuals interested therein as stockholders, creditors and debtors, forbid the supposition that any such change was intended. The object of the statute was to prevent, mitigate, or remedy great evils. It is peremptory in its provisions, and upon proof of the fact, allows to the chancellor no discretion, but requires the exercise of the powers conferred upon him. It certainly was not the object of the statute that those extraordinary powers were to be exerted in a case of doubtful ability or questionable solvency. The statute is explicit and peremptory, that the imputed insolvency *shall be proved.* What then was the fact which the attorney general was required to establish in this case to justify the interference of the chancellor? The fact proved, if the evidence offered was legal and sufficient to establish any fact, was, that the corporation had stopped payment. But is that proof of insolvency? The chancellor, with manifest corectness, considered that the fact " that the bank

ALBANY,
Dec. 1829.

Bank of Columbia
v.
Att'y General.

ALBANY,
Dec. 1829.

Bank of Co-
lumbia
v.
Att'y General.

had stopped payment was not *conclusive*, but only *prima facie* evidence of insolvency." '

In the case of *The Jefferson County Bank* v. *Chapman*, (19 Johns. R. 321,) Judge Woodworth, who delivered the opinion of the court, said, "The bank stopped payment in July, 1819, but there is no proof of *insolvency*." The judge in that case may have regarded the fact of stopping payment as *prima facie* evidence of insolvency, but *not proof* of that fact. In the case of *Stewart* v. *The Mechanics' and Farmers' Bank*, Ch. J. Spencer said, "a bank may be quite solvent notwithstanding it fails to redeem its bill." And he quotes with approbation the language of Dallas, judge, in 5 Taunton, 548, "that a man may be in difficulties and not stop payment; he may stop payment and not be insolvent, and he may be insolvent and not be a bankrupt." Stopping payment is therefore, at best, only equivocal and inconclusive evidence of insolvency. Does proof of that satisfy the requirement of the statute, that *insolvency shall be proved?*

The difficulty of establishing the fact of insolvency does not, to my mind, furnish any reason for believing that the legislature intended a relaxation in the rules of evidence or mode of proof. If there be an intrinsic difficulty in the case, the presumption is, that view was taken and contemplated by the legislature. If they intended the chancellor should act upon a *prima facie* case, they would have made such a provision in the act. By requiring *proof* of insolvency, with a knowledge of the difficulty of furnishing it, the inference appears fair, that it was not the intention that a receiver should be appointed except in extreme cases.

It is not the fault of courts if the legislature pass laws difficult of execution. The case must be extreme indeed that will justify courts in violating any of the established principles of the common law, to give effect to a statute entirely destitute of provisions indicating such an intention on the part of the legislature.

But was the evidence sufficient to establish any fact? It consisted of the affidavits of the attorney general and the comptroller, both testifying substantially to the same things; neither stating any fact as within his own knowledge, but both

expressing their *belief*, founded upon certain public rumors. In the case of the *Bank of Chenango*, (1 Hopkins, 596,) the affidavit of the attorney general was precisely the same as that of the same officer in this case, and Chancellor Sanford held that to be insufficient proof under this statute. It is true, that the allegations in the information were different in that case but the proceedings were under the same section of the same act, the powers to be executed were the same, derived from the same source, the mode of proceeding the same, and the object and intended effect the same. It is not perceived how an affidavit which was insufficient to prove any allegation, can be sufficient to establish the fact of insolvency which is expressly required to be proved. In that case there was only one affidavit, in this case there are two : but if one is not evidence of any thing, surely the addition of another of precisely the same character cannot furnish the required proof. In this case the affidavit of the comptroller contains no statement of facts within his own knowledge affecting the corporation charged, but like that of the attorney general, contains the expression of a belief, founded upon a statement a little more amplified, of rumors, reports and publications.

The chancellor appears to have been in some measure influenced by the consideration that the appellants, when required, shewed no cause " to induce the court to believe that the bank was able to pay its debts." Were they required to furnish evidence of their ability ? When a defendant answers and is silent as to a matter that is distinctly charged, and is material, and which may be presumed to be within his knowledge, it may be deemed to be admitted. In this case the defendants had not answered, and were not required to answer. The statute requires nothing from them, in the preliminary proceedings which it authorises only upon proof, to be furnished by those who prosecute. Can that principle to be applied to them upon an order to shew cause why a receiver should not be appointed, when the attorney general is expressly required to furnish the proof of insolvency, which alone, in this case, could justify the appointment ? was the *silence* of the defendants upon a preliminary order the proof contemplated by the statute ? The appellants had certainly

a right to rely upon the insufficiency of the proof offered in support of the application. In such a case it would be rigorous to consider an allegation proved because the party against whom it is made did not disprove it. It may well be that the officers of a corporation may not be able at all times, and upon a sudden call, to furnish proof of its ability to pay its debts, although such may be the fact. But however convincing silence may be under other circumstances, and however safe the reliance upon it as evidence may be, I am persuaded that it is not the kind of *proof* required by the statute under which these proceedings were had, to justify the interference of the chancellor.

Was the evidence offered to the chancellor legal evidence? It has been decided that the evidence to justify the issuing of process under the provisions of a statute requiring the process to issue upon *proof* "*must be legal evidence. Such evidence as would be admissible in the ordinary course of judicial proceedings.*" (10 Johns. R. 167. 11 id. 176.)

And if this kind of evidence is exacted in cases of comparatively small importance, surely equal care and strictness are requisite in matters vastly more momentous to individuals and to the public. Evidence of reports, rumors and publications in newspapers is certainly not such evidence as would be admitted in the ordinary course of judicial proceedings. If it ever could be admitted it would be necessary to give it effect, to prove that the reports, rumors and publications had come to the knowledge of the persons against whom they were to be used. If such proof had been given it might perhaps have been accompanied by evidence of a direct and immediate contradiction, or of such explanation as would deprive such reports, rumors and publications of all tendency to furnish the required proof of insolvency.

There was no evidence that the notes of the bank had ever been presented and payment refused, or that the officers of the institution had given notice that its bills would not be redeemed. The affidavits may have been exactly true as to the existence and currency of such reports, rumors and publications, and yet it might also have been true that payment had never been refused. This is not a case of necessity, re-

quiring any departure from the established course of judicial proceedings. If a bank refuse payment of its notes when presented, that is a fact which can always be unequivocally proved. Evidence of failure to redeem its bills can always be obtained by application to the institution itself. It is a matter in which there never need to be doubt or uncertainty. But every monied corporation is exposed to the circulation of adverse rumors ; and it is not a matter of extreme difficuly to give them the claim to belief and confidence which they can derive from appearance in the columns of a newspaper. The situation of such institutions would be perilous indeed, if the existence and currency of such rumors, without evidence of their truth, were sufficient to justify the fatal proceedings contemplated by the section of the act in question. The object of the act is to prevent frauds ; but if such a doctrine were established it would be in the power of fraudulent men, by the creation of such reports, essentially to injure, if not to ruin, the most solvent institution.

No possible injury may have resulted in this case, but the precedent would be dangerous in a matter so important, and where it would be so liable to abuse, to relax, or disregard those rules of evidence which experience and wisdom have established, to insure certainty in matters of fact.

I am therefore of opinion that there was not before the chancellor sufficient legal evidence to constitute the proof required by the statute, and that the order of his honor the chancellor should, for that cause, be reversed.

Mr. Senator MATHER was for a reversal of the order of the chancellor ; concurring in the views of Senator MAYNARD on the question of the insufficiency of proof.

Mr. Senator OLIVER was of opinion that the proof originally exhibited to the chancellor was not sufficient, within the meaning of the act, but that by the course pursued by the appellants, they had admitted the *insolvency* of the bank. Instead of applying for a dissolution of the injunction, they combat the appointment of a receiver, the amount of the security required from him, and the prohibition of a nomina-

ALBANY,
Dec. 1829.

Bank of Co-
lumbia
v.
Att'y General.

ALBANY,
October, 1829.

tion of the officers of the bank to the appointment of receiv-
er. He therefore expressed himself in favor of an affirmance
of the order of the chancellor.

On the final question of affirmance or reversal the members
of the court arranged themselves as follows:

*For affirmance*—Chief justice SAVAGE, Mr. Justice SUTH-
ERLAND, Mr. Justice MARCY; Senators S. ALLEN, BENTON,
ENOS, HUBBARD, OLIVER, STEBBINS, THROOP, TODD, WARREN,
WATERMAN, WHEELER WOODWARD, 15.

*For reversal*—Senators E. B. ALLEN, HAGER, MATHER
MAYNARD, M'CARTY, McLEAN, McMARTIN, REXFORD, SAN-
FORD, SMITH, and VIELE, 11.

Whereupon the decretal order of the chancellor was AF-
FIRMED.