THE STATE V. THE SOUTHERN PACIFIC RAILROAD COMPANY.

To authorize the institution of a suit, in the name of the State, to forfeit the charter of a corporation, it is not necessary that the legislature should, by some general or special statute, have authorized and directed it to be brought.

The constitutional provision, that "two-thirds of the legislature shall have power to revoke and repeal, all private corporations, by making compensation for the franchise," is not a limitation upon the power of the state, confining it to that mode of revocation alone.

In order that the will of the state may be known, as to whether or not a forfeiture shall be claimed, it is not necessary that the legislature should enact a special law, directing suit to be brought.   For, whenever the state declares, by its legislature, that a particular act of malfeasance or nonfeasance, by a corporation or its officers, shall incur a forfeiture of its charter, the discretion is *then* exercised, and the will of the state, that the forfeiture shall be claimed, is then expressed ; and as officers cannot suspend the operation of the laws, it is their duty to give effect to that will.

Such a suit, instituted by the attorney-general *and* the district attorney, is properly brought ; so far as the duties of those officers are expressed in the statute, it seems to fall more appropriately within the province of the district attorney to prosecute this, or any other suit for the state, in the District Court.

Where the state has declared, by its laws, that upon the happening of certain events, or the omission of certain things, the franchises granted to a corporation shall be forfeited, the forfeiture of the charter is such a right, in which " *the state is interested*," as will authorize the district attorney, under his general authority, to file a petition for the purpose of having such charter forfeited.

The failure of the president or vice-president, and a majority of the directors of a railroad corporation, to reside in this state after the 19th of June, 1858, as required by the Act of 1857, is a good ground of forfeiture of the charter ; that the act was passed after the organization of the company, under its charter, does not affect the validity of the act, or render it liable to the objection that it is an unconstitutional provision, which impairs the obligation of the contract.

A count in the petition, setting up as a ground of forfeiture, the insolvency of the corporation, and its inability to perform the trust, must give the *data* from which the conclusion can be drawn, that the company is certainly unable to carry out the object of its charter.

A count, in such petition, setting forth as ground of forfeiture, that the company had failed, after notice, to make a report, required by an act of the legislature to be made, *on notice being given by the comptroller*, is insufficient,

if it do not aver the issuing of the notice as required by the act; but merely that the notice was issued *from the comptroller's office.*

A count in the petition, alleging as ground of forfeiture of the charter, a sale of the road under a deed of trust, to secure the payment of its debts, is insufficient, if it do not show that the company executed the deed of trust in any manner binding on them, or what were the terms of the deed.

Wherever *facts* are presented which conclusively show, that the high public trusts, involved in the franchise granted to a corporation, have been grossly abused to the public detriment, or that the company has placed itself, or is placed in such irretrievable embarrassment as to be certainly unable to progress with the enterprise, as contemplated by the charter, then the State has a right to resume the franchise.

Mr. Justice ROBERTS is individually of opinion, that a charter of incorporation is not a contract, within the meaning of that clause of the constitution which prohibits any law from being passed "impairing the obligation of contracts."

APPEAL from Harrison. Tried below before the Hon. Charles A. Frazer.

This suit was brought by the State of Texas against the Southern Pacific Railroad Company, to forfeit its charter.

The original petition alleged but one cause of forfeiture, viz., the failure of the company to make, for the year ending October 1st, 1855, to the comptroller of public accounts, the annual report required of all railroad companies in the state, by the 18th section of the general railroad law of February 7th, 1853; and the failure to make such report for more than three months after service upon one of its directors, of the notice prescribed in the 19th section of the said act. The petition also charged, that the company did not report for the years ending, respectively, the 1st of October, 1856 and 1857; and that the said act provided, that any corporation (railroad company) which should neglect to make such report, and which should further neglect to make the same, after being notified through the president, or any director thereof, *by the comptroller,* of a failure to comply with these provisions, should forfeit its charter. The petition showed, that a notice, setting forth the requirements of the law, and the failure of the company to comply with the same, was, on the 10th day of July, 1856, issued from *the office of the comp-*

*troller* of public accounts, and was duly served on William T. Scott, a director of the said company.

The plaintiff filed an amended petition, consisting of several counts, and claiming the forfeiture on seven different grounds, among which were the following, viz.: that "for the space of twelve months next preceding the filing of the petition, the company had been, and still was, wholly bankrupt and insolvent, and entirely unable to carry out and perform the terms, conditions, and stipulations of its charter, or any essential portion of the provisions of the same; that the said company could not, by reason of said insolvency, construct or build a railroad of any length or distance whatever; and that it could not, for the same reason, operate that portion of the road already constructed, but had been forced, by reason of its bankruptcy, to discontinue the exercise of this privilege, franchise, and immunity, granted to it as aforesaid," &c.

· And also, "that on the 1st day of June, 1858, the road-bed, track, rolling stock, powers and privileges of the company, and all other property belonging to the same, were exposed to public sale and outcry, to the highest bidder for cash, before the court-house door of the county of Harrison, in the city of Marshall; and it was then and there proclaimed, that the said sale was then and there to take place, by virtue of a certain deed of trust, theretofore, to wit, on the 19th day of October, 1857, executed by the said company, upon the property and franchises aforesaid, to secure the payment of certain debts then and before that time due, and owing by said company to divers individuals, and corporations." The amendment alleged, that, accordingly, on the said first day of June, 1858, the sale took place, and that Jefferson M. Saunders purchased the said property and rights, advertised for sale as aforesaid, for the sum of $40,000; that the purchaser, and those claiming title under him, took possession of the road-bed, track, rolling stock, and other corporal property of the company, and had ever since held the same, exercising the franchise of using, and operating, and constructing the said Southern Pacific railroad.

The State v. The Southern Pacific R. R. Co.

The plaintiff set forth the incorporation of the company, by the several acts of the legislature, and annexed them as exhibits to the petition, whereby it appeared, that the company was incorporated in the year 1852; that it was organized subsequently thereto, and before the enactment of the Act of February 7th, 1853, entitled "An Act to regulate Railroad Companies." By the terms of the latter act, among other requirements applicable to the railroad companies subject to its provisions, it was provided, that every such corporation should make an annual report to the comptroller of public accounts of this state, of the operations of the year, ending on the first of October, which report should be verified by the oath of the treasurer, and acting superintendent of operations, and filed in his office by the 20th of October, in each year. The act further provided (as alleged in the petition) that any corporation which should neglect to make such report, (as to the various matters stated in the act, and set forth in the petition,) and which should further neglect to make the same, after being notified *by the comptroller* of a failure to comply with these provisions, should forfeit its charter.

The other grounds relied on by the plaintiff, for a forfeiture of the charter, need not be stated. The petition and amendments thereto were signed by James H. Willie, attorney-general of the state, and J. M. Clough, district attorney of the sixth judicial district.

The defendant filed general and special exceptions to the petition and amended petitions. The grounds specially set forth in the exceptions were, *inter alia*, as follows:

1st. That the original petition does not show that the suit is instituted by the authority, or with the assent, or consent, of the State of Texas.

2d. That the original and amended petition does not show how, or by what legal authority the suit is instituted and prosecuted.

3d. The petition does not set forth, with sufficient certainty, the name of the person from whom the alleged pretended notice issued.

4th. That the petition is evasive in this, that it does not, with sufficient certainty, set forth the name of the officer, by whom said pretended notice issued, and does not show that the notice was served by the comptroller of the state.

5th. That it is not charged that the said notice was written by the comptroller of the State of Texas, nor affirmatively stated that the comptroller ever issued the notice which was served as alleged.

On the hearing of the exceptions, the court sustained both the general and special exceptions of the defendant; and the plaintiff amended, by alleging that the service of the notice charged in the original and amended petition, to have been made upon William T. Scott, as director of the Southern Pacific Railroad Company, was made on the 10th day of July, 1856, by George J. Durham, at that time chief clerk of the comptroller's office of said state, by handing the said Scott the notice described in the original and amended petitions.

The exceptions being again considered, were by the court sustained; and the plaintiff declining further to amend, judgment final was rendered against the plaintiff, dismissing the suit.

*Asa H. Willie,* for the appellant.—In order the better to understand and discuss the points presented by this appeal, it will be necessary to inquire somewhat into the nature of corporations, and into the origin and character of the proceedings by which their charters are judicially forfeited. Numerous definitions of a corporation have been given by different jurists and law writers, which it will not be necessary to repeat. They all agree, that a corporation is an artificial being, created by the government, existing only in contemplation of law, and possessing many of the properties and attributes of a natural person. (2 Kent, Com. 215; 1 Kyd, on Corp. 13; Ch. J. Marshall's opinion, in Dartmouth College v. Woodward, 4 Wheaton, 630; Angell & Ames on Corp., Introduction, §§ 1, 2, 3, 4, 5.) The franchise is to the corporation, what the soul is to the natural man. It is called into existence by a grant of the franchises, and a seizure of this by the granting power, works

a dissolution of the corporation. Such franchises can only be conferred, in England, by the king's consent, either impliedly given, where they exist by common law or prescription, or expressly granted, as where they are conferred by the king's letters patent, or act of parliament, to which the royal assent is, of course, essential. (1 Blackstone, Com. 472-3.) The necessity of a kingly grant is apparent from the very nature of a franchise, which is defined by Finch, (and in this definition he has been followed by all subsequent writers,) to be "a royal privilege existing in the hands of a subject." (Finch, 164; Angell & Ames on Corp. § 737.) No subject would be endowed with a portion of royalty, merely for his own private emolument, but the public benefit enters largely into the consideration of the grant. Hence, all franchises are granted upon trust that they shall be exercised, and that in the manner intended by the act of incorporation; and that for misuser or nonuser of these franchises, they shall be forfeited. (Ch. J. Holt, in King v. Mayor of London, 1 Shower's Rep. 280; 23 Wend. Rep. 221; Angell & Ames, § 774, and authorities there cited.) When, therefore, a corporation misused, or failed to exercise its franchises, the condition upon which they were granted, was broken, and they were thereafter considered usurpers of the rights originally conceded to the corporators. But although they were so esteemed, yet the corporation still continued to exist, *de facto*, at least both as to the government and third persons, until the forfeiture was judicially ascertained, enforced, and the corporation dissolved.

Thus, there was a difference between a forfeiture and a dissolution; the latter being the civil death of the body politic, and the former, an offence, for which its artificial existence might be taken away at the will of the government. But as in the case of a natural person who had committed a capital offence, the sovereign power might grant a pardon, so in that of a corporation, it might forgive the forfeiture, and waive the enforcement of the penalty. And so long as the granting power forbore to exercise its rights in this respect, no third person could claim the forfeiture, in a collateral suit, or in a direct proceeding against such

body to enforce it, any more than could a defendant in a collateral action, plead that the plaintiff had committed a capital offence, in abatement of his suit, or could institute a direct proceeding against him, to convict him of such crime. (See Angell & Ames on Corp. § 777, and numerous authorities cited in note 3; Id. § 93, and authorities cited.) Of a nature similar to the franchise of being a corporation, was the franchise of holding an office, either under the government, or in a public corporate body. The king was considered the source of these also; the person who should oust an intruder into any one of them, or deprive of his franchise, him who had forfeited the same. (Id. § 731.) The principal law officer of the crown of England, is the attorney-general; he derives his appointment from the king, holds it during his pleasure, and appears for the crown, in all cases where it is interested. (3 Blackstone, Com. 27; Rex v. Wilkes, 4 Burr. 2570; Burrill's Law Dic. verb. Attorney-General.)

This officer was, therefore, the person who represented the king, in all proceedings instituted in his name, to forfeit the charter of a corporation, or seize the franchise of a usurping officer. (Angell & Ames on Corp. § 731.) His authority thus to appear for the crown, in prosecutions against corporations, depended on no special grant of power from the throne, or the parliament, but was a common law right, coeval in its commencement, with the creation of the office itself.

The proceeding by which a charter was forfeited, was either a writ of *quo warranto,* which afterwards, in practice, was superseded by the information in the nature of that writ, or by a *scire facias.* Although it is laid down by Chancellor KENT, 2 Com. 313, that the *scire facias* is the proper remedy against a corporation which was properly constituted at first, but which has subsequently forfeited its charter, and the *quo warranto* to be used where the original constitution was defective; or in other words, where the corporators have originally usurped its franchises, yet the weight of authority is decidedly with Mr. Justice BLACKSTONE, who holds that a *quo warranto* is the proper proceeding against a corporation which had forfeited its charter. (1 Blackstone, Com.

485; Angell & Ames on Corp. § 734; State v. Bank of Charleston, 2 M'Mullan, Rep. 439; Banton v. Wilson, 4 Texas Rep. 402, 406; State v. Paterson and Hamburg Turnpike Company, 1 Zabriskie, 12.) When, therefore, it was brought to the knowledge of the attorney-general, that a corporation had committed an act of forfeiture, or an officer was illegally exercising an office, it was his privilege, and his duty, to file an information in the nature of a *quo warranto*, against them, in the Court of King's Bench. This he did of his own authority, whenever he thought proper, without any application to the court for leave. (Angell & Ames on Corp. § 734; Banton v. Wilson, 4 Texas Rep. 400, 406.) It being, as Mr. Justice YATES expresses it, in Rex v. Dawes, 4 Burr. 2122, an inherent right in the crown, to inquire into the claims of any office or franchise, and remove the parties, unless they can show a complete legal title. By statute of 9 Anne, ch. 20, § 4, a remedy of *quo warranto* was given, to oust persons who had unlawfully intruded themselves into the offices of public corporations; and by that act, it was provided, that the information might be exhibited, by leave of the court, at the relations of private persons, and that the names of such persons should appear in the information itself. (See the act in Willcock on Municipal Corp. 460, 461.)

This act left the law as it aforetime was, in reference to proceedings against other officers, and against usurping corporations, or those which had forfeited their charters. This latter class of informations had always been filed *ex officio* by the attorney-general; no leave of the court was necessary, in order to authorize the king's counsel to commence and proceed with them. (Angell & Ames on Corp. § 734; King v. Ogden, 10 B. & C. 230.) And if they purported to be at the instance of a private relator, it did not vitiate the information; his name might be stricken out, and the case proceed in the name of the king, as plaintiff. (People v. Trustees of Geneva College, 5 Wendell, 211, 220; Angell & Ames, § 734.)

The authorities cited, establish, then, these propositions: The writ and information of *quo warranto* against corporations, to

forfeit their charters, and against illegal officers, to oust them of their usurped rights, other than in cases provided for by the statute of Anne, are common law proceedings, resting for their authority upon no statute, and both governed by the same rules; that is, the same principles and rules obtain in proceedings against corporations, as in those against officers at common law. That the attorney-general instituted them by virtue of his office, as counsel for the king, not by the direction of his majesty, expressly given in each particular instance, or a general authority given by him, nor by virtue of any act of parliament, conferring upon the attorney-general a general power to proceed against all officers and corporations, or a special power to act in each particular instance of forfeiture and usurpation. That such proceedings are in the name of the king, and regarded as instituted by his express authority, although the attorney-general's knowledge of the facts upon which they are based, was acquired from the relation of a private person; and although he may have commenced the proceeding at the request of such individual.

Now, let us examine a little into the nature of our own government, and see some of the differences which there are between it and the English government, in reference to the creation and dissolution of corporations.    In Texas, the people are the source of all power, and they have delegated that portion not prohibited, to different officers, and departments of government.    By reference to article 2, section 1, of our constitution, it will be found, that the powers of the government of this state are divided into three distinct departments, and each of them is confided to a separate body of magistracy, to wit, those which are legislative to one, those which are executive to another, and those which are judicial to another; and that no person, or collection of persons, being one of those departments, can exercise any power, properly attached to either of the others, except in the instances expressly permitted by the constitution.    Article 3, section 4, vests the law-making power in a senate and house of representatives.    Article 31 of the General Provisions, gives two-thirds of both houses power to create private corporations, and they have

also power to repeal them, upon making compensation. Article 4, section 1, vests the judicial power in the Supreme, District, and inferior courts. By section 10, jurisdiction is given to the judges of District Courts, of all suits in behalf of the State, to recover penalties, forfeitures and escheats, and they have power to issue all writs necessary to enforce their own jurisdiction. By section 12, the appointment of an attorney-general and district attorneys are provided for, and their duties, &c., are such as may be prescribed by law. By article 5, section 1, the supreme executive power of the state is vested in the governor. By section 7, he is empowered to require information, in writing, from the officers of the executive department, on any subject relating to their respective offices. Section 10 provides, that he shall take care that the laws are faithfully executed. By reference to Hartley's Digest, Art. 65, it will be seen that it is made the duty of the attorney-general, to prosecute and defend all actions in the Supreme Court, in which the State may be interested, and also to perform all such other duties as may be prescribed by the constitution and laws of the state. Article 67 provides, among other things, that he shall counsel and advise the several district attorneys, in the prosecution and defence of all actions wherein the State may be interested, whenever requested so to do; and article 73, that he shall, at the request of the governor and certain other officers, give an opinion, in writing, in all cases touching the public interest. Article 616, Hart. Dig., makes it the duty of each district attorney, to attend all terms of the District Court, in the district in which he may have been elected; to conduct all prosecutions for crimes and offences cognisable in such court, to prosecute and defend all other actions in which the State may be interested, and to perform such other duties as may be prescribed by the constitution and the laws of the state. Articles 125, 126, and 127, adopt the common law as the rule of decision in our courts.

These are all the clauses of the constitution and statutes which it will be necessary to cite at present, for the consideration of the question now under discussion. That question is, can the

attorney-general and district attorney of a judicial district in
Texas, *ex officio*, or by direction of the governor, institute pro-
ceedings to forfeit the charter of a railroad corporation, when it
is brought to their knowledge, that acts of forfeiture have been
committed by such body; or is it necessary for these officers to
be thus empowered, to proceed by an act of the legislature?
As has already been remarked, this question of the governor's
power to order the proceeding, does not legitimately enter into
the discussion, because the record does not disclose any facts, tend-
ing to show that the executive took any part in the institution
of this suit.   But his honor, in the court below, based his de-
cision principally upon the ground that the governor had caused
the petition to be filed without any authority; that it was his
case, and not that of the State; that the people had not con-
ferred upon him any such power, and the suit was therefore dis-
missed.   It is clear, from the authorities already referred to,
(Commonwealth v. Fowler, 10 Mass. Rep. 290, 293, 294, 295;
State v. Paterson and Hamburg Turnpike Co., 1 Zabriskie,
Rep. 9; People v. Trustees of Geneva College, 5 Wend. Rep.
220; Angell & Ames on Corp. § 734, pp. 758, 759, 4th edit.,)
that if it were the fact, that the governor had no such power,
and had unwarrantably exercised it in this instance, and such
fact appeared from the face of the papers, still it would not viti-
ate the proceeding.

In Commonwealth v. Fowler, the solicitor-general of Mas-
sachusetts, incorporated in his information, the order of the
house of representatives of that state, requesting him to file
it, and expressly stated, it was by virtue of this authority,
that he had instituted this proceeding.   In his opinion, JACK-
SON, J., said: "The solicitor-general having a right, *ex officio*,
so to do, has filed this information.   The request of the house
of representatives, which the solicitor has thought proper to
insert in the information, has no effect to alter the character
of the proceeding."   SEWELL, J., was still more explicit; he
says: "Proceedings of this kind are to be instituted by a regu-
lar officer of the government.   When he files an information, I

think we are bound to presume that he files it *ex officio*. The order of the house has no operation, either to extend or limit his official powers or duties. It may be rejected as surplusage. In short, I must consider the information, as exhibited by the solicitor-general, in virtue of the general powers of his office, and therefore duly brought before us." PARSONS, C. J., says: "In the information now before us, it is the solicitor-general who acts and appears through the whole of it. He undertakes to state the motive which induced him to act, and I am satisfied it was a legal and proper one. He was under no necessity of inserting the order of the house of representatives in the information. I still, therefore, consider him as acting *ex officio*, and upon his own responsibility."

In People v. Trustees of Geneva College, the information was filed against a corporation by the attorney-general, at the relation of a private person, and the court held, that although it was unnecessary to file the information upon the relation of any one, it was not vitiated thereby ; the statement of the relation was mere surplusage.

Let us consider the case, then, as presented by the record, and see whether it was properly instituted by the attorney-general and district attorney. The names of both these officers appear to the petition; and if, therefore, it came within the limits of the legitimate powers of either of them, the court should hold it correctly brought.

By reference to some of the sections of our statutes already quoted, it will be seen that we have adopted into our system, the common law; and it has been held frequently by our Supreme Court, that the writs which were used at common law, by the English courts, may also be used in our own courts, for the purpose of enforcing their jurisdiction, and administering justice between parties. (See the learned opinion of HEMPHILL, C. J., in Banton v. Wilson, 4 Texas Rep. 402, 407; see also, Wright v. Allen, 2 Id. 158.) It is in the former, distinctly held, that the writ of *quo warranto* will lie in this state, against any person or corporation, as well for the usurpation, as for the *non-user* or *abuse* of

any particular franchise or liberty. It had been decided, in the case immediately preceding, Fitzhurgh v. Custer, 4 Texas Rep. 391, that the introduction of such common law writs, did not necessarily bring with them the rules of practice, by which they are regulated in England. As the genius of our system is to simplify common law proceedings, there would seem to be no necessity for going through with all the formalities belonging to the writ of *quo warranto*, at common law; but simply to file a petition, setting forth the cause or causes of forfeiture, which might be pleaded to by the defendant, as in ordinary suits, would be sufficient to try the title to a franchise in this country. The general principles, however, of the writ, as also in the writ of *mandamus*, are binding upon our courts. The *quo warranto* being of force in Texas, in what court should the proceeding be instituted? In some of the states, if not in all, the writ of *quo warranto*, is used in the highest court of original jurisdiction, and that is the Supreme Court, in some of the sovereignties of this Union. But in Texas, the District Court is the highest court having original jurisdiction of this proceeding.

By what officers should the proceeding be filed? At common law, as we have already seen, the attorney-general filed such information *ex officio*, as counsel for the crown, the usurpations and forfeitures being considered in derogation of the rights of the king. The king is the source of all power in England; in our country, it is derived from the people. Franchises and charters are granted by him; here they are conferred by the legally constituted representatives of the people, the legislature. The attorney-general and district attorney, are the law officers of the people in Texas; the one to represent them in all cases, wherein they are interested in the Supreme Court, and the other to represent them in such cases, in the District Courts. They both derive their offices, from an election by the people, and are not dependent for continuance of the same, upon the will of either branch of the government alone. These officers, then, stand in nearly the same relation to the people, as the attorney-general in England does to the crown.

Why then, should there be any difference in these powers, in reference to corporations and officers? We have shown, that the attorney-general proceeded of his own will against them in England, and this is so stated in Judge HEMPHILL's opinion, above referred to. He says, the writ of *quo warranto* was the king's writ of right, and issued whenever his attorney thought it expedient.' Why the necessity of an act of the legislature, in Texas, to give the people's officers the right to obtain such a writ? The argument in the court below, against the right of these officers to institute this proceeding, was based upon the ground, that we have no statute, which says in so many words, that the attorney-general, or district attorney, shall have power to institute suits against defaulting corporations; that these officers are only endowed with special powers, and can only exercise such, as are conferred upon them by the constitution and the laws, and therefore, are not authorized to conduct this proceeding. What is the meaning of the term, special powers? In making use of it, do counsel mean to say, that the power of these officers to conduct a suit, in behalf of the State, must be specially delegated in each particular instance, or do they mean that a general statute, authorizing them to bring all suits of *quo warranto* against corporations, would be sufficient? If the latter be their position, we contend we have such statute, in those which adopt the common law, and define the duties of the attorney-general and district attorney. The former does not, in so many words, introduce the writ of *quo warranto*, nor is that proceeding once alluded to in our constitution and laws; yet our courts have held, in the two cases already cited, that such writs formed a part of our judicial system, and relied upon no other authority for their decision, than the general statute above mentioned, and that clause in our constitution, which gives to the courts power to issue all writs necessary to enforce their jurisdiction. We can see no reason, why there should be a greater necessity, for a special statute to confer authority to file the writ, than to confer it upon a court, to entertain jurisdiction of the same. The judges, are as much officers of special

powers, as are the prosecuting attorneys. This his honor distinctly announced as his opinion; yet they can issue all common law writs without special authority, but the State's attorneys can have nothing to do with this prosecution, for want of such particular grant of power.

It is true, that several states of the Union, whilst introducing the writ of *quo warranto*, have enacted, that it shall be issued on application of the attorney-general, and counsel said, that this was sufficient to empower that officer, and should have been the course taken by our own legislature upon the subject; holding, that because some other states had expressly mentioned these officers' names, it was good reason in favor of its necessity, in order to confer upon him the power. To meet this argument, it is sufficient to say, that those statutes have also expressly introduced by name, the writ or information of *quo warranto*. Then it must be necessary, that this proceeding should be mentioned by name in our statutes, or it cannot be used in our courts. But the late learned Judge LIPSCOMB, in Wright v. Allen, and HEMPHILL, C. J., in Banton v. Wilson, were of an opposite opinion, and held as above stated, that the proceeding was carried on legitimately in our courts, under the general statutes, and provisions of our constitution above cited, in which their names are not mentioned. The Chief Justice in the latter case, even said, that it was unfortunate that any of the common law writs had been introduced by name. (4 Texas Rep. 406.) Now, the attorney-general, and district attorney, are vested with general powers, in the same manner that the courts are. The latter have power to issue all writs, necessary to enforce their jurisdiction; the former have power to represent the State, in all cases wherein she is interested. In order to determine, whether or not, the courts have power to issue any particular writ, we have only to inquire, whether or not, it is one necessary to enforce their jurisdiction; to determine whether the prosecuting officers have the right to conduct any particular suit, we have only to inquire, whether or not, it is one in which the State is interested. Is then a suit against a corporation, for the forfei-

ture of its charter, one in which the State is interested? It will hardly be denied. It is one, in which she seeks to redress a violation of her laws; in which she seeks to recall a charter granted by herself, upon conditions which have been broken; and in which she seeks to deprive it of that portion of sovereignty, which was originally conferred upon it, for the purpose of promoting the public good, but which is being used as an engine of oppression, or at least, without benefit to the people of the country. It would seem, then, that the duly constituted law officers of the state, the district attorney, in the District Court, and the attorney-general, in the Supreme Court, are the proper persons, to represent her interest in such prosecution. But we are not without authority, too, in our own courts, upon this question. In Wright v. Allen, above cited, the court held, that "the writ of *quo warranto*, should be in the name of the State, by the *prosecuting officer;*" counsel said, that this decision was made in the case of a proceeding against a usurping officer, and was not applicable to one against a defaulting corporation. In what consisted the difference of the principles, applicable to the two cases, was not stated, and we think that it will be difficult to find. We have already seen, that at common law, the right of being an officer was equally a franchise with that of being a corporation. These rights were each of them derived from the same source, and the proceedings to seize them again into the hands of the granting power, were, by the attorney-general, in each instance, in the same court, and by the same authority. The rules governing the informations are the same, and all law applicable to the one, is applicable to the other, the only officers to which different principles apply being those provided for by the statute of Anne, viz., those of municipal corporations. Moreover, we have no statute recognising the right of the attorney-general to institute a *quo warranto* proceeding against a person who usurps an office, and if they have such authority, it must be by virtue of their common law powers, coupled with those given by the statute before cited. They are not specially delegated, and yet they most certainly

possess them, or our Supreme Court is sadly in error. It is not correct, therefore, to say that these officers have no powers but such as are especially delegated to them, in so many words, by the constitution and statutes of the country. Such doctrine, beside being in opposition to the authorities, is contrary to good reason. If the State's officers are to have special authority to proceed with each particular species of process in our courts, then would it be necessary for legislatures to make specific mention of every writ, suit, execution or other process, and give the attorneys power to make use of them, or they could never control them in any manner, for the purpose of enforcing her rights.

Corporations, as we have seen, are artificial persons, and as such subject to all laws enacted for the government of our citizens, which are applicable to their condition. (2 Kent, Com. 295; Providence Bank v. Billings and Pittman, 4 Pet. 562; Angell & Ames on Corp. §§ 4, 441.) Why, then, require a more specific grant of power to proceed against them than against natural persons? Our statute makes it the duty of the district attorney to appear for the State in the prosecution of all indictments, and under this he has power to prosecute an indictment for *murder*, though his name and office be never mentioned in connexion with a prosecution for this offence. It gives him power to represent the State in all cases wherein she is interested, and under this authority he brings suits against defaulting tax collectors, upon their bonds; why can he not, under the same general grant, bring a suit against defaulting corporations? The argument of counsel, on this subject, makes this merely a question, of how general a statute may be, and yet give special powers to an officer. The statute, upon which we rely, is a general law; such an one as that which the opposite counsel held to be sufficient, is but one degree less general, a species of which the former is a genus, and which is itself a genus of other species.

If their reasoning be tenable, that a statute, authorizing the State's officers to conduct all cases in which she may be party, is not sufficient to empower them to conduct proceedings against corporations, how can they contend that a statute authorizing

the attorney-general to proceed against corporations, is sufficient to enable him to proceed against railroad companies. If the legislature is specially to designate every kind of case over which the state and officers are to have control, how clumsy will the administration of our laws be rendered. There is no better reason, as has been remarked, for requiring such particular legislation in regard to the officer, than in regard to the remedy. And so it was contended, by at least one of the counsel in the court below, that unless a special remedy be provided for the recovery of a statutory penalty, none could be enforced. So far from such being the law, the contrary has been decided by our Supreme Court. In The State v. Williams' Executors, 8 Texas Rep. 384, the court went farther, and held, that even where a statute had prescribed a particular mode of proceeding to recover a penalty, the State was not bound to pursue that remedy, but might resort to an entirely different one.

It seems unnecessary to argue so plain a proposition, at any greater length, or to cite other authorities to sustain our position. However, a few decisions of the courts of other states will be brought to the attention of the court, in support of the proposition contended for by the State's counsel. In Commonwealth v. Burrell, 7 Barr, 34, a *quo warranto* was issued, at the suggestion of Edgar Corwan, to try the title of Thomas White to the judgeship of the 10th Judicial District of Pennsylvania. Defendant moved the court to quash the writ, because he was not bound to answer the suggestion of a private individual. The court sustained the motion that the proceedings should have been instituted by the attorney-general. It is to be remarked, that the attorney-general did not appear in the case, or take any part in the proceedings; which distinguishes this from the case of Commonwealth v. Fowler, 10 Mass. 290; and also from the case cited from 5 Wend. 220, for the attorney or solicitor-general was the person who used the name of the relator in the two latter cases. Hence the court held, that giving the name of the relator in them, was surplusage, and did not vitiate the information, for the State's officer could go on with the writ, of his own authority. But in the Pennsylvania

case, if the name of the relator had been stricken out, there was no authorized person left to carry on the proceeding. The court, in giving their opinion, cite the Massachusetts case, as containing the law. The learned judge, in delivering his opinion upon the case, makes use of the following language, which I think very pertinent to the present case: "For all cases within the exclusive jurisdiction of the Supreme Court, the omission of such a provision," alluding to a provision made in the Pennsylvania Act, for cases similar to those provided for by the statute of Anne, "is proof of a design to leave the impetration of the writ to the regulation of the common law, and, consequently, to put the control of it exclusively within the power of the attorney-general." Words could not be stronger to show that, at least in the opinion of that learned judge, (C. J. GIBSON,) whenever provision was made by a common law state, for the filing of a *quo warranto*, the power to do so, of his own authority, rested with the attorney-general, by virtue of his office, as at common law.

To the same effect is the decision of Judge MARSHALL, in Commonwealth v. Lexington and Harrisonburg Turnpike Company, 6 B. Monroe, Rep. 397. The proceeding here, was against a corporation at the relation of a private person, and the State's officers took no part in the proceeding, but specially disclaimed the prosecution. The court held that the information might have been founded upon the affidavits of private persons, upon which the attorney-general might act, and that the court, under such circumstances, would have allowed the information. It is remarkable, that in all these cases, the court referred entirely to the common law, for the power of the attorney-general of their own state, and never once derived it from their own statutes; and C. J. SAVAGE, in People v. Trustees of Geneva College, 5 Wend. 212–220, a case heretofore referred to, says, that the Revised Statutes of New York are, in this respect, but declaratory of what the law was before. Commonwealth v. Fowler, 10 Mass. 290, 293, 294, has already been cited upon another point, and is very full upon the present question. The judges delivered their opinions *seriatim*, and although THATCHER, J., differed from the ba-

lance on one question, they all agreed as to the right of the solicitor-general to file the information *ex officio*.

The Commonwealth v. Union Insurance Company, 5 Mass. 231, is the case read by counsel in the court below, and relied on by them as authority to sustain the position that the State's officers have no power to file an information against a corporate body, without direction of the legislature.    We respectfully submit, that the opinion establishes precisely the opposite doctrine. It was a motion for a rule against the defendants, to show cause why the solicitor-general should not be directed to file an information, in the nature of a *quo warranto*, against them, that the said company might be dissolved.    The motion was made by Sullivan, an attorney, who was not solicitor or attorney-general. All that was contended for by defence was, that the proceeding ought to have been directed by the government, or at least filed, *ex officio*, by the solicitor or attorney-general.    The court held, among other things, that an information for the purpose of dissolving a corporation or of seizing its franchises, cannot be prosecuted but by the authority of the commonwealth, to be exercised by the legislature, or by the *attorney or solicitor-general*, acting under its direction, or, *ex officio, in its behalf*.    Precisely what we claim for the attorney-general and district attorney in this case, to institute the proceeding, *ex officio*, in behalf of the State.

Atchafalaya Bank v. Dawson, 13 La. 497, was another case much relied on by defendant, in argument, but has no pertinency to the question now under discussion.    It was an action, by the bank, against the indorser of a promissory note, to which the defendant pleaded, that the bank had suspended specie payments, and that thereby its charter became *ipso facto* forfeited. The court held, that although the statute of Louisiana declared such suspension an *ipso facto* forfeiture of the charter, such forfeiture could not be taken advantage of in a collateral action by a debtor of the bank; that the State alone could insist on it in a direct proceeding for that purpose; and that until such proceeding was instituted by the State and prosecuted to judgment, the bank still continued to exist, and could sue and prosecute actions

as though no act of forfeiture had accrued. This is the effect of that decision, and none other can be given to it. Not even a *dictum* is to be found anywhere in it to the effect, that the State's officers could not proceed against a corporation, by virtue of their offices, for forfeiture of charter. Such decision, if the court had seen proper to make it, would not have been in accordance with the practice of that state, for numerous cases are to be found in her reports, of proceedings instituted by her law officers against corporations, for a forfeiture of their charter. The case, in fact, decides nothing more than the general principles heretofore announced as law, viz., that a dissolution of a corporation may be pleaded collaterally, but a forfeiture cannot.

Now, the filing of the petition, the issuing of the writ, &c., are generally as necessary steps towards the execution of the law, as is the final process, which derives its validity from these preliminary proceedings. It occurs to us, that when a state constitution imposes a duty upon any particular officer, it gives him power to make use of all proper means to perform that duty. When it says, that the governor shall take care that the laws are faithfully executed, gives him law officers to represent the State in courts of justice, and provides pleadings and process to be used by them, in those courts, it intends that his excellency, through such officers, courts, and process, shall carry her laws into effect. Such strict construction of the powers of the government, as that held by his honor, is greater than the warmest advocate of state's rights contend for, in reference to our Federal constitution. He would have every power to be exercised by the executive, judiciary, or legislature, specially conferred, and the means of carrying them into effect, specially granted, also. Just here, we might well ask, in what part of the constitution the court found the power to institute this suit, specially delegated to the legislature? we think it would be hard to find, and yet he held the legislature could do it. The commencement of a suit is not, in its nature, the exercise of legislative powers; nor are they particularly judicial, as the court was disposed to consider them, although he said they belonged to the legislature. If the legislature is to

meet, and take notice of every law that is violated, before an officer can proceed with the prosecution of the offender, then will our government be the clumsiest upon earth. If the people are to express their wish in each instance, as to whether an infraction of the law is to be punished, we might as well abolish the three departments, and let the citizens of the state meet in some prairie, and institute, try, and determine prosecutions for all manner of offences. His honor says, the true enquiry is, has the State of Texas manifested its will that this suit shall be brought ? and holds, that this manifestation of will must be by an act of the legislature, passed subsequent to the violation of the law, ordering her attorney-general to prosecute the proper suit to vindicate her rights.

Now, we take it, that every law is enacted for some purpose, and that when it is passed by the legislature, the will of the people is manifested that it shall be enforced; that it is not necessary first to pass a law, and then after it is transgressed, to pass another, requiring it to be executed. If the contrary doctrine be true, an offender might well say in answer to any charge against him, I have violated no law of the state, which had any force at the time of the commission of the deed; and as to the subsequent statute, giving strength and efficacy to the former, it is *ex post facto*, and unconstitutional. If his honor's position be correct, no person throughout this country can be prosecuted for any offence, be the same murder, or hog stealing, until the legislature meets and directs an indictment to be found against him, for, perhaps, it is not the will of the people, that the State should take advantage of her rights in this respect. The court would say to the district attorney, when he arose to prosecute the indictment, " sit down, my friend, you have no authority to go on with this case. It is not among your delegated powers to appear for the State in a case of this sort. The attorney might reply, that the State had made it a penal offence to steal a hog, and said he should prosecute all offenders against the law." "Yes, his honor would reply, " but it has not expressly said, in so many words, that you shall prosecute for hog stealing; and you are an

officer of special delegated powers. Moreover, how do I know that the people wish this prosecution carried on? You have not informed the governor that this offence was committed; he has not reported the fact to the legislature; the latter has not spoken for the people and said, whether the prosecution against this criminal shall be carried on, or whether they will repeal the law altogether, and set the prisoner free." Now, there is no difference in principle, between laws against corporations and laws against other persons. A statute against one is expected to be enforced, as well as a statute against the other. The fact that the legislature may waive the forfeiture, makes no difference. She may also repeal a criminal law, and refuse to punish an offender; but we are to presume her intention is the contrary, until it is plainly shown by an express statute. It is true, that the proceeding for a forfeiture is of a civil character. What difference does that make in the case? The proceeding against a defaulting tax collector on his bond, is of a civil character, and the legislature may release him and his securities, or memorialize the governor so to do, after judgment; but à court would not dismiss a suit against them, merely because the legislature might at some future time meet, and waive the forfeiture.

This doctrine of waiver seemed not to have been distinctly understood by the court. We say it with all due deference to the acknowledged legal abilities of his honor. A government may waive a forfeiture committed by a corporation, but her intention in this respect must appear distinctly, and cannot be inferred from a mere failure to take any steps against it. The law on this subject is well declared by C. J. RUFFIN, in Attorney-General v. Petersburgh and Roanoke R. R. Co., 6 Iredell, 469, 470. He says in effect, that the sovereign or law-making power, with a distinct knowledge of the forfeiture committed, may by an act, remit the penalty; or it may do so by dealing with a corporation as lawfully existing, but that the omission of the legislature to take immediate legal steps to enforce the forfeiture for a cause most notoriously existing, or even a statute recognising the actual exercise of the corporate functions, will not necessarily

receive that construction.    So, in Angell & Ames on Corp. § 777, 4th ed., p. 816, it is said, "an act of the legislature will not be deemed a waiver of conditions, and a confirmation of the charter, unless the intent of the legislature in that respect be expressly declared, or is necessarily to be implied from the provisions of the act." To make the silence of the legislature amount to a waiver, is to run contrary to all the law upon the subject.

The main question of difference between law writers and jurists upon the question heretofore, has been as to the construction of statutes which have been passed in reference to a corporation, after an act of forfeiture has been committed, whether or not they waived the forfeiture without express words to that effect; and we do not think it has ever been held, that the not passing any act about them, would be attended with that result. If such doctrines were law, it would be dangerous for the legislature to meet and adjourn, without examining carefully into the manner in which every railroad company in the state had conducted itself; for if they did not take special notice of their errors, and order suit against them, the State's remedy would be gone forever. The Act of February26th, 1848, (Hart. Dig., Art.1417,) gives the governor power to remit fines and forfeitures of a pecuniary character, at his discretion; and to remit forfeitures of lands, or of rights and privileges of any character whatever, known to our laws, whenever he shall be memorialized by the legislature in a joint resolution, setting forth the character of the forfeiture which they may wish remitted. Now, if the doctrine of his honor be true, that because the pardoning power may waive a forfeiture, it is to be presumed that it does, until it takes some step to enforce it; then every person against whom a forfeiture has accrued, may plead in his defence that the governor has remitted it, because he has not said anything about having it collected; or might enjoin a process issued against his lands upon judgment of forfeiture, on the ground that the legislature have the power to memorialize his excellency, and have the penalty remitted, and as they have observed a complete silence on

the subject, it is their intention that the law shall not be executed. If the court's opinion be correct, it must be because corporations are the peculiar favorites of our laws, or that from their nature, they are above the power of all statutes. Mr. C. J. NELSON, in People v. Kingston and Middleton Turnpike Co., 23 Wend. 205, said he " could perceive no reason for not holding them accountable upon principles applicable to individuals to whom valuable grants have been made, upon conditions precedent or subsequent." Nor is there any reason for giving them any special exemptions from the consequences of violating the laws. (See State v. New Orleans Gas-light and Banking Co., 2 Rob. La. Rep. 532, 533.) Thus much for his honor's opinion upon this point, which is certainly erroneous, both in its premises and conclusions. The true construction to be placed upon a law passed by the legislature is, that the people wish it enforced; and that legislation is done for some practical purpose, and not as a mere matter of amusement. Every provision of the constitution enters into and becomes part of all laws thereafter enacted upon the same subject-matter. The provision as to the right of eminent domain, enters into every act granting land to an individual, and he takes it with the tacit understanding that the State may resume it at any time by making compensation. The provision that the laws are to be faithfully executed, enters into every law which prescribes a duty, or declares a right. The section of an act of 1853, under which this suit was originally brought, contains tacitly this provision, and it would be a dereliction of duty on the part of the executive, did he allow it to be infracted, without attempting at least to vindicate the rights of the state. It may be, that an occasional act is to be found upon the statute books of some of our sister states, requesting the attorney-general, or some other officer, to institute a suit against some corporation, as was the case in Indiana, with the Bank of Vincennes. This, however, is no argument in favor of the necessity of such act, for a hundred cases may be found in the books of suits against defaulting corporations, in which nothing is said of any special act of the legislature.

Where such special acts are passed, it is either because the State's officers have neglected, or refused to do their duty, or it is because the facts upon which the suit was founded came particularly within the knowledge of the legislature, and were not known to the governor or attorney-general.

*P. Murrah*, for the appellee.—The original petition, and first count in the amended petition, allege a failure to report under the Act of February 7th, 1853, to regulate railroad companies.

The first point to be determined is, whether this act is binding on the company, at the time of the alleged failure to report, which could only have been for the year 1855; as it is not pretended that a notice was given until the 10th July, 1856.

This company was chartered under the name of the Texas Western Railroad Company, on the 16th day of February, 1852.

This charter was amended by a supplementary act, approved February 7th, 1853; but this is not the law approved the same day, regulating railroads, and requiring a report to be made.

On the 16th day of February, 1856, another act was passed, "to amend the caption, and the first and sixteenth section of an act to incorporate the Texas Western Railroad Company, approved 16th February, 1852." These acts were accepted by the company. This last act provides, that the company shall be subject to all the provisions of the general railroad law of this state. It also declared that this Act of 16th August, 1856, shall take effect from its passage. The acceptance of this act, brought with it the " provisions of the general railroad law of this state," then in existence. The act said to be referred to, is this Act of 7th February, 1853, entitled, " An act to regulate railroad companies." As the Act of 16th August, 1856, only took " effect from its passage," so the Act of 7th February, 1853, entitled, " An act to regulate railroad companies," could only be binding upon this company, from the passage of the former act. It therefore follows, that this company was not bound, by any law, to make a report to the State, until the 1st

8

day of October, 1856. If the company failed to make a re-
port, at this time, it is not alleged that any notice was served
upon it, at all, calling for such report, and unless such notice,
good and sufficient under the statute, were served upon the com-
pany, there could be no forfeiture of charter.

But it may be contended, that as the amendatory act of 7th
February, 1853, and the "Act to regulate railroad companies,"
were passed on the same day, therefore the company is bound by
both, by accepting the former. There is nothing in either act, re-
ferring to the other, making the one part of the other. By the 24th
section, of 7th article of the Constitution of this state, it is pro-
vided, that " every law enacted by the legislature, shall embrace
but one object, and that shall be expressed in the title." In
Sedgwick on Statutory and Constitutional Law, page ·52, it is
said, that this provision is " applicable to all bills, whether
public or private." The objects and subject-matter of the two
acts are different; the one, as expressed in the title, is "An act
supplementary to an act, to incorporate the Vicksburg and El
Paso Railroad Company;" the other, as expressed in the title,
is " An act to regulate railroad companies." The one is a
private, and the other a public act. They cannot be construed
together, under the rule applicable to statutes, in *pari materia.*

Sedgwick, at page 247, says, " It is well settled, that in con-
struing a doubtful statute, and for the purpose of arriving at
the legislative intent, all acts on the same subject-matter are to
be taken together, and examined, in order to arrive at the true
result." The rule is only applicable to cases, where it·is doubt-
ful, what is the legislative intent, in a particular act. There is
no such doubt in either of these acts; but it is said, in these
two counts, that the company is bound by all the provisions of
the act, passed the 7th February, 1853, entitled, " An act to
regulate railroad companies." It cannot be for the reason as
alleged, that the company accepted the provision of the Act
of 16th February, 1853, amending the Act of 16th February,
1852, by organizing under it on the 26th day of April, 1853.

The chartered rights of a company, do not date from the

day of organization, but from the date of the charter, where certain persons, named in the charter, are incorporated as a company. (Pierce, 62, n. 1; 21 Vermont, 30; Angell & Ames on Corp. 78–83.) The charter is a contract between the State and the parties accepting it. (Angel & Ames on Corp. 28, n. 1, 33, 75–81.) It is a contract between the government and the corporators. (2 Kent, Com. 305; 4 Wheat. 318; Pierce, Amer. Railroad Law, 19, 28, 29, 30, n.; Sedgwick, Cons. & Stat. Law, 341.) The grant of a charter is an inviolable act. (Id. 27, 28.) Subsequent legislation cannot subject a railroad company to obligations not imposed in the charter. (Id. 20.) The charter of a private corporation, is an executed contract between the government and the corporators, and the legislature cannot repeal, impair, or alter it, against the consent, or without the default of the corporation, judicially ascertained and declared. (Angell & Ames on Corp. 878, 829 n., and a host of authorities referred to therein.) This contract must be governed by the well known principles which govern contracts generally. (1 American Railway Cases, 63.) An act changing, in some important particulars, the obligations imposed under a charter, is not binding on a company, unless accepted by the company. (Id. 20.) It is the statute which creates the subscribers for stock, a corporation, and not their organization under it. (Id. 231.)

The Act of 7th February, 1853, to regulate railroad companies, is a penal statute. "A forfeiture is always to be regarded as a punishment inflicted for a violation of some duty enjoined upon the party by law." (State of Maryland v. Baltimore and Ohio Railroad Co., Id. 20.) It must be strictly construed. (Sedgwick, Stat. & Cons. Law, 324, 327.) As a penal statute, this act cannot be held applicable to this company, until the Act of 16th August, 1856, was accepted by it. This act, providing that the company should be "subject to all the provisions of the general railroad law of this state," shows that the legislature did not consider the act applicable to the company before that time. These two counts allege, that by the organization, on 26th August, 1853, the company was entitled to all the privileges and rights granted under

the Act of 16th February, 1852.  The causes of forfeiture alleged
in the 2d, 6th and 7th counts, in the first amended petition, and
the first count in the second amended petition, are all substan-
tially based upon the prohibitions of the act passed the 19th of
December, 1857.  This act is a general law, and highly penal
in character.  It forfeits the corporate life of every railroad com-
pany, for exceedingly slight offences, such as a failure to "keep
the list of stockholders at the principal office of the company,
on the line of its road;" to hold meetings of the directors for the
transaction of business, at the office so required to be kept; also
the residence of a majority of the directors, and the president or
vice-president in the state.  This act declares, that on a failure to
comply with these terms, the company should not be entitled to
the benefits of the land grant, or the state loan, "and the char-
ter of said company shall be forfeited."

This act cannot apply to this company because : 1st, It has
not accepted its provisions.  (1 American Railroad Cases, 20 ;
Pierce, American Railroad Law, 20, 27, 28.)  2d.  It imposes
the obligation of the contract expressed in the charter.  (Pierce,
American Railroad Law, 19 ; Sedgwick, Stat. & Cons. Law,
133, 618, 619, 625, 649 ; 4 Wheaton, 628 ; see Constitution
of the United States, 10th section of the 1st article; and of
the State of Texas, section 14, Bill of Rights.)  3d.  It inter-
feres with vested rights.  (Sedgwick, Cons. & Stat. Law,
156–159, 163, 167, 672–674, 695.)  4th.  It is retroactive.
(Sedgwick, 188, 191–197, 202, 406 ; see Constitution of Texas,
section 14, Bill of Rights; 14 Texas, 179.)  The legislature
may create, but cannot destroy a corporation, or without its con-
sent, alter, or amend its charter.  (Angell & Ames on Corp.
878, 879, n. 1.)  Sedgwick, at page 673, says that "the
legislative power is the most formidable with us, and that
our system chiefly aims to guard the citizen against the legisla-
ture, to protect him against the power of a majority taking the
shape of unjust law; that the unjust action of government, with
us, is most likely to take the shape of attacks upon rights of
property.  Any act enlarging the powers of the State, over the

corporation, impairs the obligation of the contract. (6 Smedes & Marshall, 522, 622.)

All causes of forfeiture were waived by the legislature, up to the 16th August, 1856, by the passage of that act. (9 Wendell, 380, 381; 9 Ohio Reports, 289, 290; Pierce, Railroad Law, 508; Angell & Ames, 777; 13 Louisiana Reports, 97; 6 Smedes & Marshall, 233.) The Act of 16th February, 1857, section 17, provides that the commissioners should hold their first meeting at Marshall, "but all subsequent meetings may be held at such times and places, as the directors may think best." The Act of 7th February, 1853, has the same provision. There can be no forfeiture for non-user or mis-user, or abuse, unless the acts from which these causes are deduced, are violations of some positive commands in the charter, or the failure to perform duties therein expressly enjoined, or a hopeless, and utter abandonment of the great leading object of the charter.

All the cases go to one or the other of these points, as in the case of the Commercial Bank of Natchez v. The State of Mississippi, 6 Smedes & Marshall, 600. The failure of the bank to pay its bills, bonds, notes, and other liabilities in specie, on proper application, was held to be a ground of forfeiture. It was held, a paramount duty of the bank, to redeem its notes in specie. (Id. 618.) In this case, an act had been passed, requiring banks to resume, and declaring a forfeiture for a failure to pay specie. (Id. 622, 623.) But in the 10th volume of Ohio Reports, 536–539; it is held, that the suspension of specie payment by a bank, may continue long enough to forfeit a charter, but it must amount to insolvency; suspension for one year was held not sufficient. In the case of the Bank of Indiana v. The State, 1 Blackford, 268, the charter was forfeited for gross acts of fraud, in violation of the grand leading conditions and restrictions of the charter; slight deviations will not do so, it is said. (page 275.) Death of all the members will dissolve a corporation aggregate. (Angell & Ames, 768.) Loss of integral part, dissolution thereby results from an inability to restore the lost part. (Angell & Ames, 770; 2 Kent, Com. 308.)

A few cases of forfeiture of bank charters may be found, but we have found no case where a railroad charter has been forfeited by the courts, for any cause. There are many cases where efforts have been made to forfeit charters of banks, and insurance companies, for causes decided insufficient; we will give some of these causes held insufficient. In the case of Commercial Bank of Natchez v. The State of Mississippi, it was held that a "failure to sell stock of subscribers who had not paid their calls," was not a cause of forfeiture. (6 Smedes & Marshall, 615.) At page 621, it is held, that "conditions in a charter are to be held as conditions in individual contracts, and to be construed most favorably to the grantee; that a substantial compliance is all that is required; that courts should incline against a forfeiture. The deduction of counsel is, that a mere temporary suspension will not be cause of forfeiture." In the case of The State of Ohio v. The Urbana and Champaign Mutual Ins. Co., 14 Ohio Reports, 77, it is held, that lending money at twelve per cent., and discounting paper at from fifteen to forty per cent., and not insuring property for four years, and receiving deposits as a bank, were not grounds of forfeiture. The charter is the law of the case. If none of its provisions have been violated, it is difficult to find any ground to demand its surrender. (page 10.) Having long ceased to elect officers, and exercise franchises, is not a sufficient mis-user or non-user, as to authorize a seizure of corporate franchises. (John v. Farmers and Merchants Bank of Indiana, 2 Blackford, 369; referring to The People v. Runkel, 9 Johns. Rep. 147.) An assignment is neither a surrender nor forfeiture. (24 Pick. 49; 13 Smedes & Marshall, 577.) Every suspension of the uses of franchises for a limited time, does not amount to a breach of condition and ground of forfeiture; a reasonable allowance must be made for peculiar circumstances and exigencies; a substantial compliance is all that is required. (State of Mississippi v. Commercial Bank of Manchester, 13 Smedes & Marshall, 578.) A charter is not forfeited for failure to elect officers for twenty years. (5 Johns. Ch. Rep. 378.) Rights are not forfeited for violation of condi-

tions precedent, but for conditions subsequent. (6 Smedes & Marshall, 612, 613.)

In private corporations aggregate, the stockholders compose the company ; the directors and officers are their agents, but not essential to their existence as such, and do not form an integral part thereof. The corporation exists *per se*, so far as is requisite to the maintenance of its perpetual succession, and the holding and preserving its franchises. (Angell & Ames, 885, 886.) A failure to elect officers on the charter day, will dissolve the corporation. (Angell & Ames, 886.) The officers of a corporation cannot dissolve it. (Angell & Ames, 887.) Mere non-user of its franchises will not dissolve it. (Angell & Ames, 773.) It is not dissolved by a sale of its visible and tangible property for payment of its debts, or by temporary suspension of its business. (Angell & Ames, 890, 891.) Not by the sale of a part, or the whole of its road, under an execution. (Angell & Ames, 891.) Mere omissions to exercise the powers given in a charter, does not forfeit it. (Angell & Ames, 894 ; Hartley, Dig. 105, Art. 78.) If a person without authority, or a stranger, commit waste, it is not a forfeiture. (23 Wendell, 586.) In doing a thing prohibited, it must appear, that it is the act of the corporation. (2 Bac. Abr. 285; 23 Wendell, 581–586.) Directors of a corporation are but agents; (6 Smedes & Marshall, 233 ;) the officers are its servants. The duties of both are pointed out by statute, or prescribed in the by-laws, which are the promulgated will of the company ; acting within the limits of the authority thus given, the company is liable for their acts, but beyond these limits, they cannot bind their principals, who are the stockholders. (6 Smedes & Marshall, 505, citing and approving the case at page 505, in 17 Mass. Reports.)

A distinction is to be observed in the construction of charters. A violation of those provisions intended for the internal government of the company will not forfeit a charter ; but a violation of positive conditions or duties, involving public interest, will forfeit. (6 Smedes & Marshall, 617.) And these are construed most favorably to the grantee. A substantial compliance is all that is

required, courts always inclining against a forfeiture. (6 Smedes & Marshall, 621.) The abuse and negligence which work a forfeiture, must be wilful; and improper accidental negligence, excess of power, or a mistake in the mode of exercising admitted powers, will not work a forfeiture. (Angell & Ames, 776.) Substantial performance of precedent or subsequent condition, is all that is required. (Angell & Ames, 898.) If a particular franchise is added by a subsequent act, its abuse will only forfeit it, not the whole charter. (Angell & Ames, 899.) The stockholders are the corporation, and may exist, if all their agents are dead. (Angell & Ames, 90.)

By first section of the Act of 16th February, 1852, the parties therein named, "their associates and successors are created and established, a body corporate and politic." The suit is for forfeiture, and seizure of the franchises of the Southern Pacific Railroad Company, not for a dissolution of the company, nor is it for a usurpation of the franchise; the allegations do not apply to a suit for usurpation at all, nor does that idea present itself in the petition at all; it follows then, that the allegation of the sale of the road, and franchises, puts the State out of court, for the road could not be sold without the franchise, and if the sale is void, as to the franchise, it is as to the road, bed, track, &c., and there is therefore no sale at all. (See Act of Legislature, 19th December, 1857.) The allegation shows no sale, or it clearly shows that the franchise is not in the defendant, and that the suit is not brought against a party, against whom a judgment could be rendered. The intention of the Act of December 19th, 1857, was to subject to sale, to make property of a franchise, and it is thus the declared policy of the state, not to recall charters or franchises, and upon this we assert, that insolvency is not a cause of forfeiture at all; the relief provided by the State in cases of insolvency, is a sale, a transfer to other hands, not a recall of a charter; it is a general waiver, so far as insolvency is concerned, as a cause of forfeiture. As to insolvency, the allegations of the petition are clearly defective; they do not show the debts, nor property, nor stock, nor the calls due on stock.

The facts ought to have been alleged particularly in a proceeding of this kind. The Act of 16th August, 1856, shows that the legislature knew the condition of the road; that ten miles at that time was graded and cross-tied, and the act provides for expenditure of more money. Why then say that the legislature was ignorant of the condition of the road; that a report was necessary to give information.

*D. S. Jennings*, *G. McKay*, and *W. H. Bristow*, also for the appellee.

ROBERTS, J.—This is a suit in the nature of a *quo warranto*, instituted by the State of Texas against the Southern Pacific Railroad Company, claiming a forfeiture of its charter, upon various grounds specified in the petition and amended petitions. Exceptions, general and special, were filed to the petition, and sustained by the court below.

The first and most prominent objection to the action is, the want of authority on the part of the attorney-general of the state, and district attorney of the district, whose names are signed to the petition, to bring the suit in the name of the State. It is contended that the State, acting in its legislative capacity, has not authorized such a suit to be brought, either by any general law, or special enactment; and that, without such authority, it cannot be maintained. That the State not having in any manner manifested its wish to proceed against this corporation, the attorney-general and district attorney, or any other person, have no right to use the name of the State in prosecuting this suit, as they have done.

This objection does not seek to call in question the right of these officers to use the name of the State in prosecuting and defending ordinary actions, in which the State has an interest against individuals or corporations. But it assumes that this is an extraordinary proceeding, involving the "life of the corporation;" that as the State, through its legislative department alone can call it into existence, that department alone can determine its existence. Or admitting that the constitution does not confine

this power alone to the legislature, then it assumes that the judiciary cannot decree a forfeiture of its charter, and the attorney-general and district attorney, cannot bring a suit for that purpose, unless the legislature has by some *general* or *special statute*, authorized and directed a suit for forfeiture to be instituted. If either of these two propositions be correct, the suit cannot be maintained; because we have no such statute.

It will be proper to consider these propositions separately, as they involve very different questions, though embraced in the same objection.

The first, is based on the section in the "general provisions" of the Constitution, which says, that "two-thirds of the legislature shall have power to revoke and repeal all private corporations by making compensation for the franchise." (Hart. Dig. 74.)

The history of corporations in the United States, exhibits the increasing tendency of capital to seek employment under their protection, as the only avenue left in this country of equal rights, to special and exclusive privileges; and the most persistent efforts to assert, maintain and perpetuate those privileges, in entire independence of the power and control of the State creating them, by appealing to the federal judiciary. Corporations have even contested the right of eminent domain in the State, and claimed an exemption from the operation of this high power, to which all other property is subject. To forestall, in part, such pretensions, this clause was inserted in the constitution. It is intended as a direct assertion of supremacy by the State, over them, at discretion, subject only to the conditions of a two-thirds vote of the legislature, and the payment for the franchise revoked. This well-considered precautionary declaration of a reserved permanent right, cannot be construed into a limitation upon the power of the State, confining it to that mode of revocation alone; for there can be no reason to suppose, that it was intended that chartered privileges which should be abused, or let go into disuse, should be paid for, or be protected, by requiring a vote of two-thirds of the legislature to get rid of that which may have utterly failed to accomplish the object of its creation.

The other proposition,—that there must be a statute *directing such a suit,* is founded upon some supposed sacredness in the rights of a corporation, beyond that which is attached to the rights of other persons. It is not contended that such a statute is necessary to enable the attorney for the State to bring suits for debts and penalties against individuals. There is no provision in our constitution, which places the rights of a corporation upon higher ground, than those of other persons. · It is only by a sort of legal fiction, in regarding them as artificial persons—citizens of the state where created—that they are entitled to the protection of the constitution. (Sect. 16, Hart. Dig. 53.) Every grant of a private corporation, confers privileges and immunities, not enjoyed of common right by the citizen, which cannot be justified otherwise, upon a supposed consideration of some direct or indirect public benefit. (Id. 50, § 2, of Bill of Rights.) It is upon that principle, that privileges and immunities are conferred on the officers of the State. In cases of usurpation, or when they forfeit their privileges, proceedings may be instituted against them, in some tribunal of the State, without enacting a statute for that purpose. They cannot claim that they hold their offices by a tenure above responsibility to all other departments of the government, except the sovereign legislative power. No citizen can claim exemption from responsibility to other departments in reference to his common rights; rights which should be the better protected, because they are common to all citizens.

What, then, is the foundation of this claim of a corporation, to the additional exclusive privilege, over and above the rights of citizens and officers, of being responsible alone to the legislative department, in determining and directing a forfeiture? It is said, that the State may waive a forfeiture; that it may not choose to exact it, though the cause of forfeiture, prescribed by law, may exist; that there is always a discretion to be exercised by the State, (involving a great question of policy,) whether the forfeiture shall be claimed, or not; which discretion still vests and abides in the sovereign power, the legislature, as it has not been

given, by statute, to the executive or judiciary, or to any officer of either of these departments.

The error of this position, it is believed, consists in the assumption, that a general or special statute, directing a suit of forfeiture to be brought, is necessary, in order that the will of the State may be known, as to whether or not a forfeiture shall be claimed. For whenever the State declares, by its legislature, that a particular act of malfeasance, or nonfeasance, done by a corporation, or its officers, shall be a forfeiture of its charter, the discretion is then exercised, and the will of the State, that the forfeiture shall be claimed, is then expressed. Such expression of its will continues in full force, until it is revoked by the legislature. It is obligatory, and imposes a duty upon all the officers of the State, who execute or administer the law. Those officers cannot suspend the law. Laws are made to be executed against those who infract them, and not to be held suspended *in terrorem.* The constitution has anticipated this, and provided for it, by saying, in the Bill of Rights, that, "no power of suspending laws in this state, shall be exercised, except by the legislature, or its authority." (Hart. Dig. 53, § 20.)

It cannot be presumed that the legislature would make an act a cause of forfeiture, which did not, in its judgment, involve such an abuse or dereliction, as to merit a revocation of the franchise. Nor can it be said, that it does not wish a forfeiture to be enforced, as the legal consequence of such abuse or dereliction, when it has so declared it shall be. When such a law has been passed, the only questions are, has the law furnished a remedy, to enforce it? and, are there officers appointed, upon whom the duty devolves, to enforce it? The will of the State, that it ought to be, and shall be, enforced, is expressed in the passage of the law.

In the adoption of the common law, we adopted the remedy of *quo warranto*, against corporations. From that system, we derive the attributes and responsibilities of a corporation, when created. (1 Blackstone, 467, 485; Dallam, 507; 2 Texas Rep. 158; 4 Id. 406; 5 Wheaton, 291.) The governor, attorney-

HARVARD LAW SCHOOL LIBRARY

general, and district attorney, are all executive officers, each acting in their appropriate sphere. Of the governor, the constitution says: "The supreme executive power of this State shall be vested in the chief magistrate, who shall be styled the governor of the State of Texas." (Hart. Dig. 64.) "He shall take care that the laws be faithfully executed." (Id. 66.) The Constitution, after providing for their appointment, prescribes, that "the duties, salaries and perquisites of the attorney-general and district attorneys, shall be prescribed by law." (Id. 63, 84.) The statute makes it " the duty of the attorney-general, to prosecute and defend all actions in the Supreme Court of the State, in which the State may be interested; and also to perform such other duties as may be prescribed by the constitution and laws of the State." (Id. 104.)

The statute makes it the duty of the district attorney, to attend all terms of the District Court, "to conduct all prosecutions for crimes and offences cognisable in such court, to *prosecute* and defend all other *actions in which this State is interested*, and to perform such other duties as may be prescribed by the constitution and laws of the State." (Hart. Dig. 226.) In England, the king could direct and control the bringing of suits, by his direct control over the officer who might be attorney-general. In this state, such direct control, as a legal power, is cut off by the independence of the law-officers of the State. Still it does not follow that all official connexion is severed between the supreme executive officer of the State, and those who represent the State in our courts. The power of the governor may be advisory or suggestive of duty in this case, as it is in many of his functions. And, although absolute subjection does not exist, harmony between executive officers, who are impelled by a common duty, is to be expected generally, unless a difference of opinion should exist as to the proper course to be pursued. That is an inconvenience, which is consequent upon maintaining the independence of the inferior officers. Its only effect may be, to prevent suits from being brought occasionally, which might otherwise be brought. But this want of subjection, and the consequent possi-

bility of a want of harmony in executive officers, do not affect the question of right to maintain the suit. It is the duty imposed, by law, on the officer, who must bring the suit, that constitutes the right to bring and maintain it.

The district attorney, as we have seen, is required, as a duty imposed on him, *to prosecute all actions in which this State is interested,* in the District Court. Bringing the action by filing a petition, is a part of its *prosecution.* There is no limitation to his duty, in prosecuting suits in the District Court, but the *interest* of the State. This is an "action in which this State is interested." It has, by a charter, vested certain franchises in a railroad company. These constitute property previously belonging to the State, which, by the grant, is now possessed and enjoyed by the company. The State has declared, by its laws, that upon the happening of certain events, or the omission of certain things, this property, the franchise, shall be forfeited. The State is interested, in a legal sense, that it shall be forfeited, if the contingency has happened. It is interested, because the company has property of the State, (the franchise,) and the consideration of the grant has failed, or the condition upon which it was granted has been broken. The State is interested in reclaiming and recovering its own, whether it be a forfeited franchise, a penalty, a debt, or other property. The district attorney has as much right to bring the suit in one case, as in the other. His only warrant, in either case, is, that the State is *interested.*

It is no answer to this, to say, that the district attorney must exercise an important privilege, in determining when the right of the State to bring the action, has accrued. That must be determined, in all suits brought by him; on bonds of officers, on debts due to the State, penalties incurred, informations, and all other suits, not specifically directed by statute. This same privilege would have to be exerted by him, if this duty was imposed on him by a statute, directing such a suit, and defining the contingency upon which it must be brought. This privilege arises out of the very nature of an executive office, and is an incident to its duties. Establish the duty, and the incident fol-

lows.   Duty gives the command, and the power to act, and neces-
sarily confers the right to determine the necessity or propriety
of action.   Whether the suit be brought at the instance of the
legislature, the governor, attorney-general, or district attorney,
this preliminary right has to be exercised by some one.   The
legislature may direct who shall exercise it, but until such direc-
tion is given, it is a power necessarily involved in the duty of
that officer, who is required to prosecute all actions in which the
State is interested.   Whoever must exercise this preliminary
right, its exercise is not conclusive; for the facts that deter-
mine the forfeiture, must be ascertained through the judiciary,
" by due course of the law of the land."   (Hart. Dig. 53.)

It is unnecessary to comment on the respective powers of the
attorney-general, and district attorney, as they have joined in
bringing this action.   While our statutes seem designed to make
a division of powers and duties between them, in representing
the interest of the State, in the several courts, they evidently con-
template a correspondence, for advice and information, between
them.   So far as their duties are expressed in the statute, it
seems to fall, more appropriately, within the province of the dis-
trict attorney, to prosecute this, or any other suit for the State,
in the District Court.

There are very few statutes requiring the district attorney,
specially, to bring suits for the State.   They most usually indi-
cate, that suits are to be brought, and defended in the District
Court, leaving it to be determined from the nature of his office,
and the province and scope of his duty, that he will act as the
attorney for the State.   An instance of that kind, is to be found
in the Act of the Legislature of 1857, in which provision is made
for "special proceedings against railroad companies."   (7th
Legislature, 244.)   This act authorizes suits or prosecutions
against railroad corporations, for wilful neglect of duty, as pre-
scribed by law.   They are to be brought in the name of the
State, in the District Court of any county, through which said
road may pass, or at the point of its commencement or termina-
tion, and are to be regulated by the rules which govern civil

suits, in the pleading, process, and trial; and still, there is not the slightest reference, as to whom is entrusted the right to determine the propriety of bringing the suit, or as to the particular officer who shall prosecute it.

It is provided, in the same connexion, that this shall have "no reference to cases where any act or omission of a railroad company operates as a surrender or forfeiture of its charter." From this, it is contended, that the legislature intended to withhold the power to prosecute for forfeiture of the charter. It is believed, that the object of this enactment was to provide adequate remedies for breaches of duty, in counties where they happened, whether that should be where the company had its principal office or not. The implication drawn from this enactment, cannot be, that the district attorney shall not bring the suit of forfeiture, for he is not mentioned in it. If it is to be indulged at all, it is a prohibition against bringing the suit, by any one, for the State. Neither the words nor spirit of the enactment require such a construction. For the last six or eight years, the legislature have been enacting laws creating and regulating railroads, and during that time, have repeatedly, in the most deliberate legislation, provided that upon the commission and omission of certain acts, their *charters should be forfeited.* These are vain and idle threats, if, during all this time, the power has been reserved by the legislature, from those, whose duty requires them to execute the laws. It would require a plain and positive enactment to justify a conclusion, so unusual, in reference to laws generally, so inconsistent with the repeated acts of the legislature, and so far out of harmony with the principle of our government; that law holds the sceptre of rule over all alike, ever ready to strike down those who violate, and to support those who obey, its commands.

If we look beyond our own state, we find nothing in the decisions of other sister states, which favors the view, that the right to bring this action is not vested in the attorney-general, or district attorney; but on the contrary, much, inferentially, to establish that it is the judicial sentiment of the whole country,

that such a right does exist, where it is not expressly reserved. (Commonwealth v. Fowler, 10 Mass. Rep. 290–295; Angell & Ames, §§ 756, 757, 758, and cases cited; Moon v. Ligon, 19 Ala. 314.)

However much credit may be due to corporations, in developing the resources of the country, in the various industrial pursuits, it would be a strange doctrine to be recognised as existing in our government, that an artificial person, created by the State, "without soul," and without body, except by legal intendment, should not be responsible to the laws of the State, to be executed against them, as they are executed against citizens, in whom is vested the sovereign power, and whose rights are specially protected by the fundamental law of the land.

We think the objection, that neither the attorney-general nor district attorney had a right to use the name of the State, in bringing this suit, is not tenable.

We think, also, that there is one good ground of forfeiture, properly alleged in the amended petition; that is, the failure of the president or vice-president, and a majority of the directors of the railroad corporation, to reside in this state after the 19th of June, 1858, as required by the Act of 1857, (7th Legislature, 26.)

By that act it is provided, "that at least a majority of the directors, and the president or vice-president, treasurer, and secretary, of every railroad company, entitled to the benefits and privileges of an act, entitled "An Act to encourage the construction of Railroads by a donation of land," approved January 30th, 1854, or of "An Act to provide for the investment of the Special School Fund," passed August 13th, 1856, shall reside within the state of Texas. The period of six months was allowed for this section of the act to be complied with; and if not complied with in that time, it was declared that the charter of said company should be forfeited.

It has not been denied, that this railroad company belongs to the class of roads referred to in this section, entitled to the benefit of the loan and donation of lands under these statutes.

9

The objection raised to this ground of forfeiture simply is, that the law of 1857, imposing this duty upon the officers of the company, is unconstitutional and void, as to this company. This law was passed, not only after the grant of the charter, but after the full organization of the company under it. And it is contended, that if effect be given to this subsequent act of the legislature, it will impair the obligation of the contract, contained in the charter, made between the State and the company. The same objection is taken to the first ground of forfeiture, that the company had failed, after notice, to make a report to the office of the comptroller of the state.

This raises the question of how far railroad corporations may be regulated and controlled, by enactments of the legislature. of the State, passed after the grant of the charter. There is nothing said in the charter about where the president, vice-president, or directors, shall reside, or about a report of the transactions of the company being made to the comptroller, or any other officer of the State. The laws requiring these things, it is contended, add new stipulations to the contract, which do not bind the company, as they have not consented to them. This is founded on the fallacious view, that the charter is a contract, as between two private persons, containing all the terms of the agreement, and that the State has no right to do anything in relation to the terms or subject-matter of the contract, which will require the company to do anything which is not required of it by the charter. The correct view of the subject is, that the charter is . a grant of franchises by the State, and the rights granted to the company, are limited by the charter. They have a right to be a corporate body—that is, a franchise; they have a right to construct a public railroad, and charge for its use; (incidental powers are conferred to accomplish these objects;) these constitute a franchise. These franchises are the private property of the company; as such, it is subject to general laws, as other property, unless the charter contains a stipulation to the contrary ; and as other property, it may be regulated, though not destroyed, by subsequent legislation. There is no restric-

tion in the charter upon the power of the State to pass these laws; they do not destroy or impair the right of property in the franchises; are not inconsistent with their general objects or free enjoyment; and are merely salutary regulations, as to the manner of enjoying and exercising these franchises, prescribed by the State, for the safety of its interest in this public work, and to insure a faithful performance of the high trust, reposed in the company by the grant. This is clearly within the constitutional power of the State.

A consideration of the well settled principles of law, in reference to the design and objects of the charter, will establish this view of the subject. First, then, this railroad is a great public highway, laid out by the State for the purpose of facilitating the public, both in the travel and in the transportation of the commerce of the country. It is only on this idea, that it is a public highway, that the State can take, or authorize the company to take, for its track, the lands of individuals on its route. The State has no constitutional right to take the land of one person and give it to another, to remain private property. (Railroad Company v. Chappel, 1 Rice, Law Rep. 388; 2 Dev. & Bat. Law Rep. 468, 469; Erie & N. E. Railroad Co. v. Casey, 2 Casey, Rep. 308. The State has reserved to itself the right, in its constitution, to repeal the charter by a two-thirds vote of the legislature, and by paying for the franchise. (Const. § 31; Hart. Dig. 74.) A general law has since been passed, authorizing the State to resume the franchises, upon full compensation. (Laws, 4th Leg., Extra Sess. of 1853, p. 58.) To encourage this public work, the State has provided for a loan of $6000 per mile, and has made a generous donation of sixteen sections of land per mile. The creation of this company, its progress with the road, and its use as it is completed, will engender rights and liabilities, as to third persons, for and against the company, which may demand regulation, and must impose a burden on the government. These are the great interests of the State in this public enterprise. The State might undertake the work itself; or it may, as it has undertaken

to do in this instance, accomplish it, through the instrumentality of a private corporation, created for that purpose. In doing this, it has not abandoned these great public interests, nor has it compressed them into the narrow confines of a few sections in the charter. The corporation is created, and invested with just such powers, as result from being made a corporate body, and also with such powers, privileges and benefits, as are specified in the charter, which were supposed necessary and sufficient to enable the company to build the road, and use it for their own profit, in the manner designed by the charter.

This blending of a private investment, for private gain, upon a public work, was well considered in the case of the Railroad Company v. Davis, by the Supreme Court of North Carolina. (2 Dev. & Batt. Law Rep. 469.) They say, that "an immense and beneficial revolution, has been brought about in modern times, by engaging individual enterprise, industry, and economy, in the execution of public works of internal improvement. The general management has been left to individuals, whose private interests prompt them to conduct it beneficially to the public; but it is not entirely confided to them. From the nature of their undertaking, and the character of the work, they are under sufficient responsibilities, to insure the construction and preservation of the work, which is the great object of the government. The public interest and control, are neither destroyed nor suspended. The control continues, as far as it is consistent with the interests granted, and in all cases, as far as may be necessary to the public use. The road is a highway, although the tolls may be private property, by force of the grant of the franchise to collect them. It is a common nuisance, to allow it to become ruinous, or to obstruct it. The government may, upon sufficient cause, claim a forfeiture of the charter, or compel the execution and repairs of the road, by those undertaking them, by any means applicable to other persons, charged with like duties, in respect to other highways. The difference is, that the corporation, in lieu of the sovereign, has the custody and property of the road, and the collection of the tolls, in reim-

bursement of the cost of construction, and remuneration for labor and risk of capital. As to the *corporation*, it is a *franchise*, like a ferry, or any other. As to the *public*, it is a *highway*, and in the strictest sense, *publici juris.*" These franchises, being private property, are amply protected, though blended with, and vested in a public work, by the spirit, if not by the letter of our constitution. "No citizen of this state, shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land." (Bill of Rights, § 16, Hart. Dig. 53; The West River Bridge Company v. Dix, 6 Howard, Rep. 534.)

Again, considering the charter as a contract, in conformity with what is now the general doctrine, the franchises are protected by the clause in our constitution, which prohibits the enactment of "any law impairing the obligation of contracts." When viewed in the light of a contract, it is not as an executory, but as an executed contract,—as a grant to land; and stands upon the ground, that a grant of land, or the grant of a franchise, implies a contract, not to re-assert the right to it. (Fletcher v. Peck, 6 Cranch, 136, 137; Dartmouth College v. Woodward, 4 Wheat. 652, 653.) But whether protected as property, or as a contract, these franchises can only be protected, so far as they may be granted; and the charter constitutes the limits of the grant. A reference to a few decided cases may explain this.

In the leading case of Fletcher v. Peck, an act of the legislature of the state of Georgia, was held to be unconstitutional, under the clause in the constitution of the United States, prohibiting the states from passing laws, impairing the obligation of contracts; because it sought directly, to annul a grant of land, made by a previous act of its legislature. Here, the subsequent act, sought to take back and utterly destroy what was previously granted, without condition or qualification. It was not a regulation of property, or of the persons claiming it, but a deprivation of it.

In the celebrated Dartmouth College Case, a corporation for literary purposes, had been created by the king of England, by

the grant of a charter, in which the privilege was granted, that twelve trustees, and no more, should control the institution, to be selected in a particular way. The act to amend the charter, passed by New Hampshire, was decided to be unconstitutional, under this clause, because it provided for the government of the college, by more trustees than twelve, to wit, twenty-one, selected in a different way, &c. By this, and other changes, as it was said, " the charter of 1769 exists no longer; it is reorganized; and reorganized in such a manner, as to convert a literary institution, moulded according to the will of its founders, and placed under the control of private literary men, into a machine entirely subservient to the government" of New Hampshire. (4 Wheat. 652.) Here, the act complained of, operated directly on the grant, and changed one of the terms of the grant.

These are the leading cases, of the class relied on by the company. The distinction between them, and the case now under consideration, is obvious, and may be made more so, by reference to another class, of equally high authority.

In Massachusetts, the Charles river bridge, was incorporated as a toll-bridge. The charter was in ordinary form, and stipulated that the charter should exist seventy years. Long before that time expired, the Warren bridge was incorporated, to be erected very near the former. By the terms of its charter, it very soon became a free bridge, by which the profits of the Charles river bridge, were entirely taken away from it. It was decided by the Supreme Court of the United States, that the act of the legislature, granting the last charter, did not impair the obligation of the contract, contained in the charter of the first. They said, as to the rule of construction, "that nothing passes by implication," and that " in charters of this description, no rights are taken from the public, or given to the corporation, beyond those which their charter, by their natural and proper construction, purport to convey." And as to the extent of the powers granted, they say, that "in order to entitle themselves to relief, it is necessary to show, that the legislature contracted not to do the act of which they complain; and that they im-

paired, or in other words, violated that contract, by the erection of the Warren bridge." "They must show, that the State had entered into a contract with them, or those under whom they claim, not to establish a free bridge, at the place where the Warren bridge is erected." (11 Peters, Rep. 539, · 548, 549.) It was held, that no such contract was expressed, or could be implied.

In the case of Providence Bank v. Billings and Pittman, 4 Pet. 514, it was held, that a law imposing a tax upon the bank was valid. The charter was silent on the subject of a tax, and it was argued that, if the State had the right to tax, it might tax so heavily as to render the charter useless and of no value. The act imposing the tax, though passed subsequent to the charter, was sustained as not impairing the obligation of the contract.

A State may take a corporate franchise, for public use, upon rendering compensation, without impairing the obligation of the contract. (6 How. Rep. 529; Backus v. Lebanon, 11 New Hampshire Rep. 22.)

The doctrine that a private corporation is strictly confined to its charter, in ascertaining the rights and privileges granted by it, is well settled in the English courts. (Stourbridge Canal Company v. Wheeley, 2 Barnewall & Adolphus, 334.)

In the case of the Ohio Life Insurance and Trust Company v. Debolt, 16 How. Rep. 437, it was decided that a State had a right to prohibit, under a penalty, the issue of small notes by a bank, by a law passed subsequent to the grant of the charter. The charter granted the general power to issue bills and notes. Chief Justice TANEY, in this case says, that "the general power to issue notes and bills, without any express grant as to small notes, is subordinate to the power of the State, to regulate the amount for which they may be issued." This case establishes the right of the State to regulate banks in their issues, so as to make them conform to its general policy as to a sound currency. And as the banks had not anticipated and guarded against this change of policy, by a restriction upon the State in their charters, they had no right to resist it.

In Mississippi, an act was passed restraining banks from transferring the notes of their debtors. This right was previously enjoyed by the banks, in common with other persons. The right of the State to debar the banks from this privilege, was contested, as impairing the obligation of the contract in their charters, which gave them a right to own, hold, and dispose of their property. Chief Justice SHARKEY stated, in delivering the opinion of the Supreme Court on this question, "It was a subject over which the legislature had entire control, when the charter was granted; and this, like all other subjects, is subject to that control, unless a clear and positive restriction has been imposed. The power of the legislature is not to be taken away by construction. If the charter had granted the power to assign these notes, so as to enable the assignee to maintain an action in his own name, then the right would have been beyond the control of the legislature. Or if this were a power essentially important to enable the bank to carry on its business, and necessarily implied by the charter, then the question would be different; but it is not. It may be very convenient for a bank to transfer its securities, but certainly such a power is not essential to its existence, or to its capacity to do business. A contract is not impaired in its obligation, unless some right or privilege, *which has been granted,* has been defeated or abridged." (Payne v. Baldwin, 3 Sm. & Marsh. 680.)

In the same state, a statute prohibiting banks from collecting their debts from the time the information, in the nature of a *quo warranto* is filed, until its determination, was sustained as constitutional. (Commercial Bank of Rodney v. State of Mississippi, 4 Sm. & Marsh. 440.) So, also, a statute changing the common law liability of bank-debtors, upon the dissolution of the corporation. (Nevitt v. Bank of Port Gibson, 6 Sm. & Marsh. 521. See also, Bank of Columbia v. Attorney-General, 3 Wend. 609, 610.)

So, a statute in Massachusetts, imposing a penalty of two per cent. per month on the amount of bills of any bank, of which

payment by such bank is refused, was held to be constitutional. (Brown v. Penobscot Bank, 8 Mass. Rep. 445.)

These authorities will suffice to indicate the general doctrine, that a State, upon granting a charter, is presumed to retain its general power of legislation. Those who claim an exemption from this general power, must show either its relinquishment of the right to pass the law in question, in the charter, or that it is inconsistent with, and destructive of the particular rights, privileges or franchises therein enumerated and granted. The State, in this case, has not relinquished the right, by anything set out in the charter, to require of this company to make a report of its transactions, as provided for in the Act of 1853, or to require a portion of its officers to reside in the state, as provided for by the Act of 1857. An exemption from these requisitions, is not necessary to enable them to carry out the objects of the charter, which, as to the company, are to build and run the road, for their own profit. They are not inconsistent with or destructive of any grant of right contained in the charter. Dispensing with them, might be a matter of convenience to the company—that is all; and that convenience to themselves they have not secured in their charter.

But then these requirements of our general railroad law of 1853, as amended by that of 1857, stand upon still higher ground. The State has an interest, that the franchises granted shall be faithfully exercised, as a public trust, in the hands of the company, so that the work shall progress; so that the road shall be used, as it may progress, for the benefit of the public, in travel and transportation. It is interested in the honest appropriation of its bounty and loan, to which the road is entitled under the laws. It would be derelict in the protection of these great interests, if it did not require such reports of the company, as would furnish full information of its transactions, as required by the Act of 1853. And considering the rule, that the residence of a corporation is in the state creating it, (13 Peters, 588,) and that that is the proper place for its corporate business to be transacted, (Angell & Ames on Corp. § 104,) the policy of the State,

in the protection of these great public interests, may well require that a portion of the officers, who act for and control the business of the corporation, shall reside in the state, as has been done by the Act of 1857. Whether the forfeiture of the charter is not a penalty too severe, for not complying with this requisition of residence, in six months after the passage of the statute, is not a question for our consideration. The legislature has determined it. It is the law.

The ground of forfeiture, that the company had failed, after notice, to make the report required by the Act of 1853, is not sufficiently stated in the petition, because it is not alleged that the comptroller issued the notice.

The petition does not allege any meeting of the directors out of the state, since the 19th of June, 1858; and the meeting of the stockholders out of the state has not been made a statutory ground of forfeiture.

The count setting up the insolvency, is too general. (Bank of Columbia v. Attorney-General, 3 Wend. 593.) It does not give the data, upon which it could be concluded, that the company were certainly unable to carry out the objects of the charter.

The count as to the sale of the road under the deed of trust, is insufficient, because it does not show that the company executed the deed in any manner to bind them, or what are the terms of the deed. It presents rather the outside facts of a public sale, proclaimed to be made under a deed of trust, &c. It has, therefore, not become necessary, to consider the effect of the alleged sale, either by itself, or in connexion with any other facts.

These common law grounds of forfeiture, must have reference to the general objects of this public enterprise, for which the franchises were granted. Whenever *facts* are presented, which conclusively show, that the high public trusts involved in them have been grossly abused, to the public detriment, or that the company has placed itself, or is placed, in such irretrievable embarrassment, as to be certainly unable to progress with the enterprise, as contemplated by the charter, then the State has a

right to resume the franchises.   The provision made by the statute of 1857, for the sale and transfer of the franchise with the road, is one mode of resumption and re-grant of the franchise, which it must sometimes be important to consider in this connexion.   A particular discussion of this branch of the subject is not now necessary.   Judgment is reversed, and cause remanded for further proceedings.

Reversed and remanded.

NOTE.—In the decision of this case, it is not necessary to examine a question which has been settled by the highest authority in this country, and seems to be acquiesced in generally; that is, whether or not the charter of incorporation is a contract, within the meaning of that clause of the constitution, which prohibits any law from being passed, "impairing the obligation of contracts." (Bill of Rights, § 14, Hart. Dig. 52.)   I desire to express it as my own opinion, that it is not.

That clause is borrowed from a similar one in the Constitution of the United States.   It was there inserted to meet and prevent a prevalent evil, which was well known at the time, and had reference to executory contracts.   A grant of a franchise is like a grant of land.   It may be construed into a contract, but it is the work of construction.   It is not treated of as a contract, and was never, as it is believed, spoken of in that connexion, by those who taught or administered the laws, up to the time of the adoption of the constitution; nor, indeed, up to the time of the leading cases of Fletcher v. Peck, and The Dartmouth College v. Woodward.

This construction met with dissent, when first adopted.   Its application to new cases, as they have arisen, has met with increasing disagreement and dissent.   If carried to its legitimate conclusion, to the full extent, the State government may, by improvident legislation, be deprived of many of its important powers, ceded, by contract, to the numerous corporations that are filling the country, without the capacity to reclaim them, except by a revolution.   I shall content myself now with citing some of the cases in which the difficulties arising out of this great question may be seen.   (Dodge v. Woolsey, 18 How. Rep. 362 ; The State Bank of Ohio v. Knoop, 16 Id. 393–405 ; 6 Id. 529, 549 ; Charles River Bridge v. Warren Bridge, 11 Peters' Rep. 571–582 ; 4 Id. 558; 4 Wheaton, 624, 654, 665, 713 ; 6 Cranch, 143–145.)—ROBERTS, J.